IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI
Honorable Thomas C. Clark, II, Judge

STATE OF MISSOURI,                  )
                                    )
            Plaintiff,              )
                                    )
    vs.                             )   Cause No. 1922-CR02199-01
                                    )
WILLIAM C. OLSTEN,                  )
                                    )
            Defendant.              )

TRANSCRIPT OF TRIAL TESTIMONY

On the 6th day of April, 2021, the
above-entitled cause came on regularly for hearing before
the Honorable Thomas C. Clark II, Judge of Division 4 of
the Twenty-Second Judicial Circuit in the City of St.
Louis.

            The State of Missouri was represented by
Jeffrey Estes and Rob Huq, Assistant Circuit Attorneys,
City of St. Louis, State of Missouri.

            The Defendant was present in person and was
represented by Mr. Brian Millikan, Attorney at Law.

Olsten Exh. A

DAWN L. MCTEER, RPR, CCR, MO-CSR, IL-CSR
OFFICIAL COURT REPORTER
CITY OF ST. LOUIS CIRCUIT COURT
TWENTY-SECOND JUDICIAL CIRCUIT

---

I N D E X

|  | Page |
|---|---|
| State's evidence | 4 |
| RANDY JEMERSON | |
| Direct Examination (Mr. Estes) | 4 |
| Cross-Examination (Mr. Millikan) | 14 |
| Redirect Examination (Mr. Estes) | 28 |
| Recross-Examination (Mr. Millikan) | 32 |
| AMIR BRANDY | |
| Direct Examination (Mr. Estes) | 34 |
| Cross-Examination (Mr. Millikan) | 44 |
| Redirect Examination (Mr. Estes) | 46 |
| HEATHER DEMIAN | |
| Direct Examination (Mr. Huq) | 47 |
| RASHEEN ALDRIDGE | |
| Direct Examination (Mr. Estes) | 61 |
| Cross-Examination (Mr. Millikan) | 78 |
| State rests | 80 |
| Motion for directed verdict | 80 |
| Motion denied | 80 |
| Defendant waives opening statement | 81 |
| Defendant's evidence | 81 |
| ERIC BARTLETT | |
| Direct Examination (Mr. Millikan) | 81 |
| Cross-Examination (Mr. Huq) | 96 |
| Redirect Examination (Mr. Millikan) | 107 |
| Recross-Examination (Mr. Huq) | 108 |
| Defense rests | 109 |
| Court Reporter's Certificate | 110 |

---

E X H I B I T S

STATE'S

| DESCRIPTION | MARKED | ADMITTED |
|---|---|---|
| 1 | Video | | 79 |
| 2 | Evidence envelope | | 79 |
| 2-A | Video | | 79 |
| 3 | Special orders use of force | | 79 |
| 8 | Photograph | | 44 |
| 9 | Photograph | | 44 |
| 10 | Photograph | | 44 |
| 11 | Video | | 46 |
| 5 | Photograph | | 79 |
| 6 | Photograph | | 79 |
| 7 | Photograph | | 71 |

---

                              TUESDAY, APRIL 6, 2021

                                STATE'S EVIDENCE

                                RANDY JEMERSON,

having been first duly sworn by the deputy clerk, testified:

                              DIRECT EXAMINATION

QUESTIONS BY MR. ESTES:

            THE COURT:  I'm sorry.  You have to keep the
mask on.  I apologize.  Keep your voice up.

            MR. ESTES:  Your Honor, I'm going to move the
podium so Mr. Millikan can see the witness.

            THE COURT:  Thank you.

    Q    (Mr. Estes)  Could you state your name?

    A    Lieutenant Randy Jemerson.

    Q    How are you employed, sir?

    A    With the St. Louis Metropolitan Police
Department.

    Q    In what capacity?

    A    I'm a lieutenant and current commander of the
civil disobedience team.

    Q    What exactly is the civil disobedience team?

    A    They're a team that's charged to handle any
incidents of civil unrest.  Also commonly referred to as a
riot team.

    Q    What training do you have to be qualified to
lead this team?

EXHIBIT
OLSTEN
MST A

1    A    I've been on the team probably as an officer
2  since the 2001 time frame.  I've been through numerous
3  operator and instructor level trainings.
4    Q    How about — I guess you already talked about
5  your experience.  That's about 20 years now since 2001?
6    A    Since I've been on the team.
7    Q    Yeah.
8    A    Roughly.
9    Q    How long have you actually led the team?
10   A    Since 2014.
11   Q    Were you leading the team back in 2017?
12   A    Yes.
13   Q    What was your role with the team at that time?
14   A    As a deputy commander of the civil disobedience
15  team.
16   Q    Did you attend the civil demonstrations after
17  the Stockley verdict?
18   A    Yes.
19   Q    To refresh the Court's memory, what exactly was
20  the Stockley verdict?
21   A    Officer Stockley was not guilty.
22   Q    Did that spark any controversy in the community?
23   A    Immediately.
24   Q    Was there any type of protest or demonstration
25  on the night of September 29th, 2017?

5

1    A    Yes.
2    Q    Were you on duty at that protest?
3    A    Yes.
4    Q    What was your role during that protest?
5    A    Again, as the deputy commander, one of two.  I
6  was just monitoring the protest.  Just making sure things
7  went, that the march continued and nothing got out of
8  hand.
9    Q    Who were you with?
10   A    At the time it was Major John Hayden, currently
11  the chief.
12   Q    Currently the chief.  Could you tell the Court
13  where you and the chief were parked?
14   A    We were in my vehicle.  I was driving.  At the
15  time we stayed behind the march for both parties.  Are you
16  talking about all the way up to that incident?
17   Q    Yes, sir.
18   A    We were on Broadway just north of Walnut.
19   Q    At any time did you and the chief get out?
20   A    After we saw the arrest, we saw Reverend Ray and
21  Calvin Kennedy were taken into custody.
22   Q    What did you do in response to that?
23   A    As we saw the crowd, the march started rushing
24  back towards the intersection.  We kind of split off.  At
25  that point, I was trying to stop the crowd from coming any

6

1  further.  I knew they were trying to rush up on the
2  subjects that were getting arrested.
3    Q    Why did you think that you could stop them?  Did
4  you stop by yourself?
5    A    I am — I've been working these protests since
6  2014.  Most of them know me.  I've probably got a better
7  chance than anybody to try and head them off ahead of
8  time.
9    Q    Did you know Reverend Gray and Cap?
10   A    Yes.
11   Q    Were they leaders?
12   A    Unofficial.  I think Reverend Gray might have
13  been the one that coordinated that march.  I can't
14  remember.
15   Q    How about Brandy or Amir Brandy?  Do you know
16  him?
17   A    Yes.
18   Q    How is that?
19   A    Again, just from working multiple protests.
20   Q    Rasheen Aldridge.  Did you know him as well?
21   A    Yes.
22   Q    How did you know him?
23   A    From working multiple protests.
24   Q    Finally, Heather Demian?
25   A    Same.  Just from working multiple protests.

7

1    Q    What did you do after — let's back up a second.
2  Were you successful in stopping the protestors?
3    A    From my vantage point, yes.
4    Q    What happened after you did that?
5    A    Several of them were asking me what happened or
6  why were they being arrested.  I had no idea at the time.
7  Again, it was me just trying to keep them at bay, calm
8  everybody down to the point that I felt some mace or felt
9  something spraying on the back of my neck.
10   Q    Were you maced yourself or pepper sprayed
11  yourself?
12   A    I just felt a few droplets on the back of my
13  neck.
14   Q    Did you actually see what happened?
15   A    No.
16   Q    Have you looked at any of the videos since then?
17   A    Yes.
18        MR. ESTES:  Your Honor, per the stipulation
19  we're going to play the Maverick video and the Demian
20  video and the RTCC video.
21        THE COURT:  How are those marked?
22        MR. ESTES:  Exhibit 1 is the Demian —
23        THE CLERK:  Do you have an exhibit list for me?
24        MR. ESTES:  Actually I gave it to your court
25  reporter.

8

1    THE COURT:  Off the record.

2    (There was a discussion off the record.)

3    THE COURT:  Any time you're ready.

4    MR. ESTES:  Go ahead.

5    (Whereupon, the Maverick video was played.)

6    THE COURT:  What was that?  That was the

7    Maverick video?

8    MR. ESTES:  Yes, sir.  This next one is going to

9    be the video from the RTTC.

10   THE COURT:  Are these on a disk?

11   MR. ESTES:  Yes.  We just saved it to the

12   desktop.

13   THE COURT:  Now what are we watching?

14   MR. ESTES:  We're watching the RTTC camera which

15   is at the corner of Broadway and Walnut.

16   (Whereupon, the RTTC video was played.)

17   MR. ESTES:  Your Honor, this third one was taken

18   by victim Heather Demian.

19   THE COURT:  Which one is that?

20   MR. ESTES:  That's part of State's Exhibit 1.

21   Heather Demian is the videographer who is embedded with

22   the protesters.

23   THE COURT:  What I'm getting ready to watch is

24   part of Exhibit 1?

25   MR. ESTES:  Yes, both videos were on the same

9

---

1    disk.

2    (Whereupon, the Demian video was played.)

3    MR. ESTES:  May I approach the witness, please,

4    your Honor?

5    THE COURT:  You may.

6    Q    (Mr. Estes)  I'd like to hand you what's marked

7    State's Exhibit 3.  We have stipulated that this is the

8    special orders dealing with the use of force in

9    September 2017.  Are you familiar with the use of force

10   orders?

11   A    Yes.

12   Q    Turn to Section 4 which is the section on pepper

13   mace.  Could you explain to the Court when it is

14   appropriate to use pepper spray in the field of duty?

15   A    We're just talking about per the special order?

16   Q    Yes, sir.

17   A    It's used to effect a lawful arrest or to

18   otherwise lawfully control combative, uncooperative

19   persons when verbal commands or persuasion have been

20   ineffective in inducing cooperation.

21   Q    Based on being present and the videos that

22   you've seen, do you have an opinion whether or not force

23   was necessary?

24   A    Just based on the videos, I'm not again -- the

25   incident occurred behind my back.  I can't speak on what

10

---

1    happened, what was going on behind me as I was facing the

2    rest of the crowd.

3    Q    You've seen the videos now; is that correct?

4    A    Correct.

5    Q    You've seen those before today, correct?

6    A    Correct.

7    Q    Do you have an opinion based on just the videos

8    then whether or not it was necessary for Mr. Olsten to use

9    force?

10   A    From my vantage point in dealing with the crowd

11   that was in front of me, the crowd that was in front of me

12   had not reached a point of being what I thought mace

13   needed to be used.

14   Q    Was Amir Brandy being combative?

15   A    Per what I saw?

16   MR. MILLIKAN:  Objection, Your Honor.  The

17   witness has already stated he didn't see the actual

18   incident what took place.  I think anything at this point

19   would be speculative on what Amir Brandy did or didn't do.

20   THE COURT:  Sustained.

21   Q    (Mr. Estes)  What happened after the pepper

22   spray incident?

23   A    Immediately after I felt just some of it on my

24   back, I kind of moved away.  I wasn't sure what happened.

25   Then at that point it was just a matter of trying to piece

11

---

1    together what happened, just trying to keep the situation

2    calm.

3    Q    When is a pepper spray fogger -- is that

4    different than the individual pepper spray cans that are

5    used?

6    A    The only difference is that is considered a

7    high capacity fogger.  As far as, when it should or should

8    not be used, basically it still falls under the same

9    special order as the hand-held mace that the officers

10   carry on their details.

11   Q    Is pepper spray or mace considered a use of

12   force?

13   A    Yes.

14   Q    Are you familiar with what's termed a use of

15   force continuum?

16   A    Yes.

17   Q    Could you explain to the Court what the use of

18   force continuum is?

19   A    Basically states an order that we should try to

20   adhere to, as far as when force should be used, with first

21   trying to obtain verbal compliance.  If verbal compliance

22   can't be made, then the use of pepper mace on to devices

23   such as tasers, asp batons.

24   Q    Go ahead.

25   A    Then anything after that would be the use of

12

1  deadly force.

2  Q   When is nondeadly force authorized?

3  A   Again, if there's an attempt to take someone

4  into custody and that person is resisting, or as per the

5  special order is a belligerent or combative person where

6  you're attempting to get that person to verbally comply

7  and fail.

8  Q   What about someone who is cursing at an officer?

9  Is that justified force?

10 A   I mean it falls under being belligerent.  Again,

11 I feel that's kind of a case-by-case situation.

12 Q   How are officers trained to deal with people

13 that are cussing at them?

14 A   That happens every day.  There's an attempt to

15 try to get that person to comply verbally.  Again, it

16 really depends on if we're trying to take that person into

17 custody or what the situation is.

18 Q   What about the situation that you watched on the

19 video?  Was his cussing at Mr. Olsten grounds to use force

20 against him?

21 MR. MILLIKAN:  Object to the extent again it

22 calls for speculation unless he's just solely basing an

23 opinion on a video.  He says he wasn't there, or didn't

24 see it, or didn't hear the interaction between the two.

25 Therefore, I think the opinion that he's asking for that

13

1  lacks foundation.

2  MR. ESTES:  Your Honor, I'm asking for what he

3  saw in the video and whether he has an opinion as to what

4  he saw in the video.

5  THE COURT:  Sustained as to foundation.

6  MR. ESTES:  I beg your pardon, sir.

7  THE COURT:  Sustained as to foundation.

8  Q   (Mr. Estes)  What else happened after that?

9  Was there anything else that happened that night?

10 A   No, I don't recall anything else.

11 MR. ESTES:  Thank you.  I have no further

12 questions.

13 CROSS-EXAMINATION

14 QUESTIONS BY MR. MILLIKAN:

15 Q   Good morning, lieutenant.

16 A   Good morning.

17 Q   I had the opportunity to take your deposition

18 last Tuesday.  Do you recall that?

19 A   Yes.

20 Q   During that deposition you made some statements

21 to me that I think we can both agree on.  I'd like to go

22 over some of that before some of the other things.  You

23 stated last Tuesday that you believe that there were over

24 70 or so protesters there that evening, correct?

25 A   Roughly.  That's an estimate.

14

1  Q   Given what you've seen on the video, the RTTC

2  video and the Damian video, you would probably confirm

3  that that number is fairly accurate, correct?

4  A   Correct.

5  Q   You had with you a group of about a dozen

6  officers that night?

7  A   There were far more than that in that area.

8  Q   What about in the area of Walnut and Broadway

9  where this incident occurred?

10 A   I couldn't tell you an exact amount.  I know

11 immediately after the civil disobedience team was at that

12 intersection — I can't recall if they were there before

13 that incident or not.  I know immediately after they were

14 all staged at that intersection.  The officers that were

15 there don't fall under me.  They fall under special

16 operations.

17 Q   Is it fair to say that prior to this incident

18 occurring or just prior to the incident occurring you're

19 not sure how many police were actually at that

20 intersection?

21 A   No.  I just saw officers again that worked for

22 special ops that were working that intersection.

23 Q   After the two arrests occurred, you had a number

24 or a large group of people running back, protesters

25 running towards the officers located at Broadway and

15

1  Walnut; is that correct?

2  A   Correct.

3  Q   You stated in the deposition and I think you

4  stated the other day that they were rushing that way,

5  correct?

6  A   They were running.

7  Q   Running, rushing?

8  A   Yes.

9  Q   At that point you said you were trying to keep

10 the crowd at bay?

11 A   Correct.

12 Q   Do you recall — let's start first with that

13 night.  Do you recall hearing any officers telling the

14 crowd to get back?

15 A   I don't recall specifically.  As you can see in

16 the video, at that point I was kind of creating a barrier.

17 There were multiple people yelling at me.

18 Q   I want to now turn to the video.  You've had a

19 chance to review that.  You went to the circuit attorney's

20 office and reviewed that after our deposition?

21 A   Yes.

22 Q   Did you hear on the deposition any officers say

23 get back?

24 A   Yes.

25 Q   How many times do you think you heard that?

16

1    A    In the Maverick video, maybe two or three times.

2    Q    Fair enough.  We may disagree on the number.  In

3 any event, you heard it?

4    A    Yes.

5    Q    Is get back a command?

6    A    Yes.

7    Q    As you're trying to create a barrier between you

8 and the officers who were taking the two individuals into

9 custody at Broadway and Walnut, where were you located?

10 How far away from that intersection and the officers were

11 you located?

12    A    Did you say prior to?

13    Q    Yes.  That's okay.  Prior to the actual macing,

14 you were not with the group of officers at Walnut and

15 South Broadway, correct?

16    A    The macing from — there were two separate ones.

17    Q    The macing that we're here for today, Mr. Olsten

18 deploying his mace.

19    A    Yes.  Prior to that happening, I was in front of

20 them facing south on Broadway.

21    Q    There was a distance separating you and the

22 group of officers, including Mr. Olsten, at the

23 intersection of Walnut and Broadway, correct?

24    A    Correct.

25    Q    Is it also true that there were people — you

17

1 were facing south away from Mr. Olsten and the other

2 officers, and there were people in front of you, south of

3 you, correct?

4    A    Yes.

5    Q    But there were also people behind you in between

6 you and Officer Olsten and the rest of the group, correct?

7    A    Yes.

8    Q    You're not sure how many, are you?

9    A    No.

10    Q    You also testified that quite a few of these

11 people were yelling and screaming?

12    A    Yes.

13    Q    They were angry?

14    A    Yes.

15    Q    You even said in your deposition that several of

16 them were belligerent?

17    A    Yes.

18    Q    Again, you could not see from your position any

19 interaction between Officer Olsten and the protestars

20 between you and him, correct?

21    A    Correct.

22    Q    You're not sure what was said?

23    A    At the time, no.

24    Q    At the time?

25    A    No.

18

1    Q    Even watching the video it's kind of hard to

2 tell what was said.  Don't you agree?

3    A    Well, the video had the back and forth prior to

4 the macing, yes.

5    Q    You were able to understand everything, but the

6 video doesn't pick up everything everybody is saying, does

7 it?

8         MR. ESTES:  I'm going to object, Your Honor.

9 That calls for speculation.

10         THE COURT:  Sustained.

11    Q    (Mr. Millikan)  From where you were that night

12 excluding the video for a moment, you didn't hear any

13 conversations that took place between Officer Olsten and

14 the protestors?

15    A    No.

16    Q    The first time you realized that Mr. Olsten or

17 an officer behind you deployed pepper mace was when you

18 felt it on your back?

19    A    Correct.

20    Q    At that point you're trying to piece together

21 what's going on, correct?

22    A    Correct.

23         MR. MILLIKAN:  Go back to Exhibit 3.  Judge,

24 would you like a copy of the exhibit to follow along?

25         THE COURT:  Yeah, that's the special order?

19

1         MR. MILLIKAN:  That's the special order.

2         THE COURT:  If you have an extra copy, that

3 would be helpful.  Thank you.

4         MR. MILLIKAN:  May I approach?  The relevant

5 portions are on what's been bate stamped 00630.

6 Lieutenant, did you give —

7         MR. ESTES:  He still has it.

8    Q    (Mr. Millikan)  State's Exhibit 3, page 00630.

9 I want to start with section three of special order

10 1-01.

11         THE COURT:  Where are we?  I thought we were on

12 00630.

13         MR. MILLIKAN:  That's the page.  At the top

14 there it says section three, special order 1-01.  Do you

15 have that?

16         THE COURT:  Pardon me.  Cancel publications,

17 section three.

18         MR. MILLIKAN:  Yes.

19         THE COURT:  I see.  It's up in the right-hand

20 corner.

21    Q    (Mr. Millikan)  Lieutenant, if you could tell

22 me the — see where it says purpose there?

23    A    Yes.

24    Q    Can you read that into the record?

25    A    Outline policies and procedures for the use of

20

1   nondeadly force by officers.

2       Q   You agree that the use of pepper mace is

3   nondeadly force, correct?

4       A   Correct.

5       Q   In fact, it's an intermediate use of force; is

6   that right?

7       A   Yes.

8       Q   If you go down there section B, subsection two,

9   do you see that?

10      A   Yes.

11      Q   Can you read that section, subsection A, B and

12  C, into the record?

13      A   Officers may use nondeadly force for the

14  resolution of incidents as follows.  Protect themselves or

15  others from physical harm or restrain or subdue a

16  resisting individual, or to bring any unlawful situation

17  safely and effectively under control.

18      Q   I want to start with that section 2-A.  To

19  protect themselves and others from physical harm.  In

20  other words, to defend themselves, correct?

21      A   Correct.

22      Q   Or to defend other officers that are with them,

23  correct?

24      A   Correct.

25      Q   How about to bring — subsection 2-C, to bring

                          21

1   any unlawful situation safely and effectively under

2   control.  In this case were there any laws being broken

3   during this march?

4           MR. ESTES:  I'm going to object, Your Honor.

5   Calls for a legal conclusion.  Also, overbroad.

6           MR. MILLIKAN:  Judge, he's a police officer with

7   20 some years experience who is charged with enforcing the

8   law.  I think he should know the laws if he's charged with

9   enforcing them.

10          THE COURT:  Overruled.  You may answer the

11  question.

12      Q   (Mr. Millikan)  Were there any laws being

13  broken that evening during that protest?

14      A   By the protesters?

15      Q   Yes.

16      A   No.

17      Q   Would you agree that they were impeding the flow

18  of traffic?

19      A   I know at some point that law changed.  I can't

20  remember at what point if that was prior to or since then.

21      Q   You're not sure today?

22      A   I know currently that that can't be enforced.

23  Right now I can't recall if that was changed after

24  Stockley or not.

25      Q   How about failure to obey a reasonable order of

                          22

1   a police officer?

2       A   That was in effect, yes.

3       Q   Would you agree that the statement get back is

4   an order of a police officer?

5       A   Yes.

6       Q   Would you agree that, if a person continues to

7   move forward and does not get back, that's a violation of

8   laws?

9       A   It's a violation of that order from that

10  officer.

11      Q   Violation of the law.  You just said that's an

12  order of a police officer?

13      A   Yes.

14      Q   Under the special order under that section 2-A,

15  number one, a policeman can protect themselves with the

16  use of nondeadly force, correct?

17      A   Yes.

18      Q   And they can also bring any unlawful situation

19  safely and effectively under control, correct?

20      A   Yes.

21      Q   At this time I'd like to move on to section four

22  which begins on page 00632.  I think you've already stated

23  the purpose of this section is to establish procedures

24  related to the use of pepper spray, right?

25      A   Yes.

                          23

1       Q   Section A-1 where it says detect mark for pepper

2   mace.  Do you see that?

3       A   Yes.

4       Q   You already read that into the record.  That

5   basically says that you can use mace when it's necessary

6   to control belligerent and uncooperative persons, correct?

7       A   Yes.

8       Q   You stated earlier that at least two of these

9   individuals were being belligerent, right?

10      A   Yes, I stated that.  I was specifically asked

11  about Amir.

12      Q   Regardless of the name, at least one person was

13  being belligerent.  In your deposition you said several.

14  One person at least was being belligerent, correct?

15      A   Yes.

16      Q   Would you agree that, when you tell a police

17  officer that you're going to fuck them up, that that's

18  belligerent?

19      A   Yes.

20      Q   And hostile?

21      A   Yes.

22      Q   It goes on to state — that same section at the

23  bottom there, section one, it states it's an alternative

24  to physical contact and intermediate option, right?  You

25  tell me.  Is this stating that the department would rather

                          24

1  a police officer use mace in this type of situation than
2  physical contact?
3      A   Where are you looking at specifically?
4      Q   That page, section A-1, same section we were
5  just on. The second sentence in that paragraph.
6      A   Correct. As an alternative to physical contact.
7      Q   Let's face it. Physical contact there's more
8  risk of injury in a situation where you go hands on often
9  times than using mace. Would you agree with that?
10     A   Yes.
11     Q   That section A-2, the next section, it states
12  that the product is designed to be sprayed directly into
13  the face and eyes of a person. Do you see that?
14     A   Yes.
15     Q   Why is that?
16     A   That is to the area you're going to receive the
17  maximum effect of the mace.
18     Q   Officers are trained to spray pepper mace into
19  someone's face and eyes, correct?
20     A   Correct.
21     Q   If they sprayed it on somebody's knees, it
22  wouldn't be nearly as effective, right?
23     A   Yes.
24     Q   It also gives a distance, an ideal distance
25  being three feet, correct?

25

1      A   Correct.
2      Q   That's because at three feet you're more
3  accurate than at 12 feet, correct?
4      A   Correct.
5      Q   Section A-3, the last sentence, pepper mace
6  causes no permanent physical harm. Do you see that?
7      A   Correct.
8          MR. ESTES: Object to the relevance, Your Honor.
9  We're not required to prove permanent physical harm when
10  we're just alleging physical injury.
11         THE COURT: Sustained.
12     Q   (Mr. Millikan) All right. We've already gone
13  over that second section where an officer may use pepper
14  mace, section B. You would agree that under the policy
15  that a police officer can use mace to control a
16  combative uncooperative person?
17     A   Yes.
18     Q   When I took your deposition, I asked you whether
19  or not the policy requires an officer to make an arrest
20  after the use of mace. At that time you told me that you
21  needed to review the policy. It had been a while, and you
22  needed to review the policy. Have you had a chance to do
23  that since our deposition?
24     A   Yes, I have.
25     Q   You would agree that this policy does not

26

1  require an officer to make an arrest after mace, after the
2  use or deployment of mace?
3      A   It is not stated in the policy.
4      Q   If it's not stated in the policy, that means
5  it's not required, correct?
6          MR. ESTES: I'm going to object, Your Honor.
7  It assumes facts not in evidence.
8          THE COURT: Overruled. You may answer the
9  question.
10     A   Yes.
11     Q   (Mr. Millikan) In fact, if an arrest was
12  required, lieutenant, you were there that night. You
13  knew mace had been deployed, correct?
14     A   Correct.
15     Q   If an arrest was required whether it be policy
16  or something else we're not sure of, you would have made
17  sure that those individuals would have been arrested,
18  correct?
19     A   Again, even that night I still do not fully know
20  what had happened. Again, special ops does not fall
21  directly under me. Again, that evening I did not know all
22  what happened and what occurred.
23         MR. MILLIKAN: Fair enough. Nothing further.
24
25

27

1              REDIRECT EXAMINATION
2  QUESTIONS BY MR. ESTES:
3      Q   Let's go back to the section 4 on the use of
4  pepper spray. One time you use it is to help effect an
5  arrest, correct?
6      A   Yes.
7      Q   Now, in this circumstance did Mr. Olsten try to
8  arrest anyone?
9      A   Again, not that I saw. As you can see in the
10  video, I was involved in still dealing with the crowd
11  right after it happened.
12     Q   How about Cap? Was he arrested that evening?
13     A   Yes.
14     Q   You saw in the video what happened with him; is
15  that correct?
16     A   Yes.
17     Q   To effect the arrest of Cap, it would have been
18  acceptable to use pepper spray, correct?
19     A   Yes.
20     Q   Because he was being arrested, correct?
21     A   Correct.
22     Q   Moving on to Mr. Brandy. Was he being arrested?
23     A   At what point?
24     Q   Well, at any point. You saw the videos. Was he
25  being arrested at any point in any of those videos?

28

1    A   No.

2    Q   How about Mr. Aldridge?  Was he being arrested

3 at any point?

4    A   No.

5    Q   How about Ms. Demian?

6    A   No.

7    Q   Mr. Millikan asked you about verbal commands.

8 Did you see or hear any verbal command given to

9 Mr. Brandy?

10    A   Yes.

11    Q   What was he told to do?

12    A   It was either back up or get back, one of the

13 two.

14    Q   Do you know who gave that command?

15    A   I just heard it.  I couldn't tell you

16 specifically which officer.

17    Q   When Mr. or Officer Olsten sprayed Mr. Brady,

18 was Mr. Brady going towards anyone?

19        MR. MILLIKAN:  Mister who?

20    Q   (Mr. Estes)  Brandy.  Sorry.  Was Mr. Brandy

21 going towards anyone when he was maced, pepper sprayed?

22    A   Again, at that point my back was turned facing

23 the crowd.  I couldn't see.

24    Q   We already looked at the videos.  Could you see

25 what he was doing when he was sprayed by Mr. Olsten,

29

1 Officer Olsten?

2    A   The videos kind of cut.  I can see movement

3 towards, but it doesn't show an exact point of what

4 happened prior to the spraying.

5    Q   Did it appear in those videos that the officers

6 were being surrounded?

7    A   Again, I had a pretty big crowd in front of me.

8 There were a few people that kind of moved around on my

9 sides.  I couldn't see fully the amount of people that

10 were between me and the officers.

11    Q   I'm also asking about what you saw in the video.

12 Not necessarily everything that you saw personally.

13    A   Yeah.  There was a good amount of people that

14 were breaking away in front of me and on my sides.

15    Q   Based on what you saw in the videos, did

16 Mr. Brandy appear to be combative?

17    A   I would say he appeared to be belligerent.

18    Q   Is there a difference between verbal

19 belligerence and physical belligerence?

20    A   I would say that would get into him getting

21 combative if it turned physical.

22    Q   You see the videos.  Did it ever turn physical?

23    A   Not that I saw.

24    Q   Did the SLMPD help facilitate this march?

25    A   Yes.  We had streets blocked off at various

30

1 locations.

2    Q   Were you directing traffic as part of that?  Not

3 you specifically.  Were officers directing traffic?

4    A   Yes.

5    Q   Were officers controlling the traffic at

6 Broadway and Walnut?

7    A   Yes.

8    Q   Is impeding the flow of traffic a situation that

9 generally calls for force?

10    A   No.

11        MR. ESTES:  If I could have a second, Your

12 Honor.

13        THE COURT:  Take your time.

14    Q   (Mr. Estes)  On September 29th, 2017, based on

15 what you saw in the video, just because a police officer

16 can use nondeadly force, does that mean that it's

17 necessarily appropriate to do so?

18        MR. MILLIKAN:  I'm going to object.  Vague.  I'm

19 not sure what the question is referring to.

20        THE COURT:  Overruled.  You may answer the

21 question.

22    Q   (Mr. Estes)  Would you answer the question

23 please, sir?

24    A   Say it again.

25    Q   I'm asking about the appropriateness of the use

31

1 of force.  Is the use of force appropriate just because an

2 officer can use it?

3    A   It depends on the situation.

4    Q   Fair enough.  In this incident considering all

5 that you've seen, was use of force necessary?

6    A   Again, from my vantage point, the crowd did not

7 seem to be at a point where mace needed to be used.

8    Q   Was all this happening within the city limits in

9 the City of St. Louis?

10    A   Yes.

11    Q   Can you identify the defendant?

12    A   Sitting at the defense table wearing a yellow

13 tie.

14    Q   Do you know his name?

15    A   Officer Olsten.

16        MR. ESTES:  Thank you.  No further questions.

17        RECROSS-EXAMINATION

18 QUESTIONS BY MR. MILLIKAN:

19    Q   Lieutenant Jemarson, you just stated that from

20 your vantage point, your vantage point, mace didn't need

21 to be used, correct?

22    A   Correct.

23    Q   In fact, you didn't use mace, did you?

24    A   No.

25    Q   Because the people in front of you, who you

32

1  could see, weren't in your mind belligerant enough, or
2  mace wasn't appropriate in your mind at that point with
3  the people that you were seeing?
4      A.  Correct.
5      Q.  You couldn't see the people behind you directly
6  in front of Officer Olsten or the other officers at
7  Broadway and Walnut?
8      A.  Correct.
9      Q.  It sounds to me like you don't have an opinion
10  on whether or not that force was reasonably necessary or
11  not, do you?
12      A.  Correct.
13      Q.  One other thing.  You talked about verbal
14  belligerence.  You agree that what Mr. Brandy was doing
15  was verbally belligerent, correct?
16      A.  Yes.
17      Q.  In your experience, does combativeness often
18  times follow verbal belligerence?
19      A.  It depends on the situation.
20      Q.  Bad question.  Let me back up.  Bad question.
21  In your experience, does verbal belligerence typically
22  precede combativeness?
23          MR. ESTES:  I'm going to object.  Foundation.
24          THE COURT:  Overruled.  You may answer the
25  question.

                                                    33

1      Q.  (Mr. Millikan)  In other words, does somebody
2  just typically, in your experience, go directly to
3  physical confrontation, or is there a period of verbal
4  belligerance?
5      A.  It's still kind of a difficult question to
6  answer.  We're talking about in my experience.  I've seen
7  both.  It could go either way.
8      Q.  Would you agree also that mace or an
9  intermediate level of nondeadly force is a way to prevent
10  the verbal belligerance from going into physical
11  combativeness?
12      A.  Yes.
13          MR. MILLIKAN:  Thank you.  That's all I have.
14          MR. ESTES:  I have no further questions, Your
15  Honor.
16          THE COURT:  May this witness be excused?
17          MR. ESTES:  No.  We'd like him to stick around.
18          THE COURT:  You're still on subpoena, sir.
19  Thank you.  You may call your next witness.
20          MR. ESTES:  Call Amir Brandy.
21              AMIR BRANDY,
22  having been first duly sworn by the deputy clerk, testified:
23              DIRECT EXAMINATION
24  QUESTIONS BY MR. ESTES:
25      Q.  Could you state your name for the record,

                                                    34

1  please, sir?
2      A.  Amir Brandy.
3      Q.  How old are you, sir?
4      A.  55.
5      Q.  Back in 2017 how were you employed, sir?
6      A.  I was employed by Smith and Associates law
7  office.
8      Q.  What were you doing for them?
9      A.  I was the manager of the law office.
10      Q.  Did you take any part in any protests following
11  the verdict in the State versus Stockley?
12      A.  I did.
13      Q.  How did you get involved in the protest?
14      A.  In that particular protest or overall?
15      Q.  Overall.
16      A.  Overall I got involved as a result of the
17  killing of Mike Brown in Ferguson.  At that point we saw a
18  need to try to make adjustments in reference to what was
19  going on with the killing of black people not just locally
20  but across the country.
21      Q.  How did you get involved specifically in this
22  demonstration on September 29th, 2017?
23      A.  On that day we mobilized to a protest that was
24  scheduled to drop a banner at the baseball game.  We
25  bought tickets.  We all went to the baseball game.  At

                                                    35

1  some point that banner on the other side of the stadium
2  was dropped.
3      Q.  What was the banner saying?
4      A.  Stop killing us.
5      Q.  Was that authorized by anyone with the Cardinals
6  organization?
7      A.  It was not.
8      Q.  You bought tickets?
9      A.  Yes, sir.
10      Q.  At some point you left the stadium; is that
11  correct?
12      A.  That's correct.
13      Q.  What was happening after you left the stadium?
14      A.  After we left the stadium, there was a
15  congregation in front of the stadium where there was
16  continued protests outside of the stadium grounds.  Law
17  enforcement was on one side of the gate, and the activists
18  were on the cyclone side of the stadium.  It was just a
19  casual protest.  Nothing really going on.  No engagement
20  between law enforcement and the community.
21      Q.  Did law enforcement actually know about this
22  protest?  Was it planned?
23      A.  Was it planned?
24      Q.  Yeah.
25      A.  They seem to know all the time that -- we

                                                    36

1  understand that we have undercovers within the protest
2  community.  There's a great chance that they do know.
3  Sometimes it's advertised as well on social media.
4      Q    Did you have a role in addition to being a
5  protester?
6      A    Yes.  I'm a videographer.  My responsibility is
7  to record for the purpose of documenting what actually
8  goes on during these protests.
9      Q    After the protests at the stadium, how long did
10 you guys stay there?
11     A    After the protest maybe a half hour.  There was
12 a congregation.  It was for the purpose of making sure
13 that everybody was out of the stadium safely.  That was
14 about a half hour I would imagine.
15     Q    What happened after you guys, after your
16 demonstration?  Did you stay there?  Did you move on
17 eventually?
18     A    After leaving the stadium and the congregation
19 outside of the stadium, the march began to proceed north
20 on I believe that's 8th Street if I'm not mistaken.  I'm
21 not sure exactly what street that is.  North towards
22 Market.
23     Q    At some point did you turn south?
24     A    At some point after going through the park,
25 through the park area across from the old courthouse, we

37

1  stopped at the corner of Market and -- right in front of
2  the old courthouse.  I'm not sure which street that is.
3  We stopped there for a moment.  Then we proceeded south
4  toward the stadium.
5      Q    At that point you were just doubling back?
6      A    Yes, sir.  From the other side of stadium.
7      Q    You've got a group.  Where were you in the
8  group?
9      A    I was in the back of the group.
10     Q    Why had you positioned yourself there?
11     A    Actually there were -- I was taking pictures.  I
12 was still taking pictures at that location in front of the
13 old courthouse.  The group proceeded in front of us which
14 left a lot of older people in the back.
15     Q    Who were older persons in the back besides
16 yourself?
17     A    Myself, Reverend Gray.  There were others that
18 were in that crowd as well.  Reverend Gray was one of the
19 older people that was in the back with myself.
20     Q    What about Cap?  Was he there?
21     A    I don't remember Cap being in the general area
22 during that time.
23     Q    Did you see or hear about anything happening to
24 either Reverend Gray or Cap?
25     A    Yes.  At some point, there was a -- we were

38

1  coming up on the intersection of Walnut, and the officer
2  asked us to hold up for a minute and let some of the
3  traffic go through.  At some point myself and Reverend
4  Gray were split up.  He was on the other side of the
5  traffic.  I was on the north side of the traffic.  Within
6  a moment Reverend Gray was being body slammed.  That sent
7  everybody into like what happened.  What's going on?  What
8  did he do?  It was so fast.  You couldn't do nothing but
9  ask what happened that resulted in this.  I think some of
10 the people were summoned back.  Some of the crowd that was
11 way ahead at that time were summoned back.
12     Q    Summoned back by whom?
13     A    I'm not sure.  I think, in general, the people
14 that were involved in the march.  Some of the people were
15 calling back to the people that were way far ahead.
16     Q    Were you actually in charge of the march?
17     A    No, sir.
18     Q    What's the next thing that happened after you
19 saw what happened with Reverend Gray?
20     A    I asked the question what did he do.
21     Q    Who were you asking?
22     A    Law enforcement.  I don't know a particular
23 officer that I was talking to.  That was the question.
24     Q    Then what happened?  Did you get emotional after
25 you were asking questions?

39

1      A    Yes, I was.
2      Q    What were your emotions?
3      A    I was angry and frustrated, because we were
4  doing absolutely nothing.  There's a pattern here of
5  over-policing which I would put in the category of being
6  abusive policing.  They don't care who they reflect this
7  type of energy to.  At the end of the day -- I think that
8  some of the officers, because we see the same officers all
9  the time with no way to distinguish who was who and be
10 able to reflect that energy on the person that they should
11 be reflecting that energy on.  In this case I just didn't
12 know.
13     Q    Did you have any contact with the defendant
14 William Olsten?
15     A    Yes.
16     Q    Did you know him from previous protests?
17     A    No.  I seen him, I believe, in a protest that
18 was on Washington and Tucker.
19     Q    Could you explain on September 29th what
20 happened between you and Mr. Olsten?
21     A    Good question.  I was asking a question what did
22 he do.  Mr. Olsten pointed the spray can at me and
23 smirked.  He mumbled something.  I'm not sure what he was
24 saying.  From the facial expressions, you can conclude.
25 That is what caused me to say the things that I said.

40

1 Q I guess you cussed at him?
2 A I cussed at him. Yes, I did.
3 Q Did you — how to phrase this. Did you take any
4 kind of like a fighting stance or clench your fists or
5 anything?
6 A I did not.
7 Q Did you do anything besides cussing at him?
8 A I think I was very expressive at that point. I
9 was very expressive in my verbiage. At the end of the
10 day, no, I did not do anything that would have been
11 considered threatening.
12 Q We already talked about Officer Olsten spraying
13 you. What happened after that?
14 A After he sprayed me, I went silent. I was
15 just — I couldn't see. I couldn't breathe. I had my
16 camera in one hand. I was just trying to find my way to
17 something solid. At some point I did reach the curb. I
18 laid down. At that point the street medics started to
19 work on me.
20 Q What do you mean by a street medic?
21 A They're people that, in the event that somebody
22 is sprayed or attacked chemically, they have, I believe,
23 Milk of Magnesia or saying that they pour into your eyes
24 to try to settle the chemical spray.
25 Q Were those people with the protesters?

41

1 A They were in the protest crowd. They kind of
2 escorted the protesters. I'm not sure whether or not you
3 could say that they are actually protesters. They were
4 among the protest crowd.
5 Q I'd like to hand you a couple pictures.
6 MR. ESTES: May I approach the witness, Your
7 Honor?
8 THE COURT: You may. Thank you.
9 Q (Mr. Estes) I'd like to hand you what's been
10 previously been marked 8, 9, 10. Those are all
11 photographs. You mentioned the camera. Do you see the
12 camera in your hand in any of those photos?
13 A I do.
14 Q Does the camera look anything like a weapon?
15 A It does not.
16 Q Was it pointed or raised?
17 A It was not.
18 Q Did you actually turn your camera off?
19 A I did not.
20 Q Did it continue to record as this was all
21 happening?
22 A Yes, it did.
23 MR. ESTES: Your Honor, this will be Exhibit 11.
24 It's a recording made by his camera while this was
25 happening.

42

1 THE COURT: Mr. Millikan, if you need to move to
2 see the video.
3 MR. MILLIKAN: I've seen it, Judge. Thank you.
4 Q (Mr. Estes) Since this was pointing down, Your
5 Honor. This is the audio. You can't see much in the
6 video.
7 (Whereupon, Exhibit 11 was played.)
8 THE COURT: Is that it?
9 MR. HUQ: No, Your Honor.
10 MR. ESTES: Your Honor, we're having some
11 technical difficulty. I'm going to move on if that's okay
12 with the Court.
13 THE COURT: Absolutely.
14 Q (Mr. Estes) One last thing, Mr. Brandy. I
15 believe you sued some people in response to this, what
16 happened to you on September 29th; is that correct?
17 A That's correct.
18 Q Why did you sue?
19 A Well, the only course of action we have is to
20 use the legal system to try to address the issues.
21 MR. ESTES: I have no further questions. Your
22 Honor, I would move pursuant to our stipulation for the
23 entry of 8, 9, 10 into evidence.
24 THE COURT: Any objection?
25 MR. MILLIKAN: No objection.

43

1 THE COURT: 8, 9, 10 are admitted at this time.
2 MR. ESTES: We have it up, Your Honor. We're
3 going to make another attempt to play Exhibit 11.
4 MR. HUQ: False alarm, Your Honor.
5 MR. ESTES: I don't have any other questions
6 then.
7 THE COURT: Thank you. Mr. Millikan, do you
8 wish to inquire?
9 MR. MILLIKAN: Yes, Judge.
10 CROSS-EXAMINATION
11 QUESTIONS BY MR. MILLIKAN:
12 Q Good morning, Mr. Brandy. Mr. Estes stated and
13 you agree that you cussed at Mr. Olsten?
14 A I did. Yes, sir.
15 Q One of the things you said was you called him a
16 pussy ass white boy. Do you remember that?
17 A I do.
18 Q The other thing you said was — the other thing
19 you said is that you, in quotes, I'll fuck you up. Do you
20 recall that?
21 A I do.
22 Q You not only said it once. You said it three
23 times, correct?
24 A That may be accurate.
25 THE COURT: I apologize. You said that may be

44

1   accurate?

2        A   Yes, sir.

3        Q   (Mr. Millikan)  While you said I'll fuck you

4   up, you were moving toward Mr. Olsten, were you not?

5        A   I don't believe I was moving towards him.  I

6   would have to actually see the video.

7        Q   Have you seen your video, the one they just

8   tried to pull up?

9        A   I have.

10       Q   You're not sure whether or not you were walking

11   towards him at the time you were saying that?

12       A   I don't believe I was walking toward him.  I may

13   have been standing still.  I'm not sure exactly what the

14   body condition was.

15       Q   We do agree that the words, I'll fuck you up,

16   were the cuss words that Mr. Estes was talking about?

17       A   Yes.

18       Q   Do you recall listening to your call phone

19   footage somebody saying, dude, back up?

20       A   No.

21       Q   You don't recall that?

22       A   No.

23           MR. MILLIKAN:  Nothing further.

24           THE COURT:  Any redirect?

25           MR. ESTES:  One second, Your Honor.

1           (There was a discussion off the record.)

2                   REDIRECT EXAMINATION

3   QUESTIONS BY MR. ESTES:

4        Q   Do you remember saying put that shit in my face

5   and I'll fuck you up?

6        A   I do.

7           MR. ESTES:  No further questions, Your Honor.

8   I'd move for the admission of 11.  We'll try to play it

9   again later.

10           MR. MILLIKAN:  No objection, Judge.

11           THE COURT:  11 is admitted.  Any recross?

12           MR. MILLIKAN:  I'm sorry.  No.

13           THE COURT:  May this witness be excused?

14           MR. ESTES:  Yes, he can.

15           THE COURT:  Mr. Millikan.

16           MR. MILLIKAN:  Yes, Judge.

17           THE COURT:  You're off subpoena.  Thank you.

18   Are we okay if we take a 10-minute break?

19           MR. MILLIKAN:  Yes, Your Honor.

20           MR. ESTES:  Yes, sir.

21           (A recess was taken.)

22           THE COURT:  We're back on the record.  You may

23   proceed.

24

25

1                   HEATHER DEMIAN,

2   having been first duly sworn by the deputy clerk, testified:

3                   DIRECT EXAMINATION

4   QUESTIONS BY MR. HUQ:

5        Q   Ms. Demian, just because we're wearing masks,

6   I'll ask if you can keep your voice up so that Judge Clark

7   can hear you, as well as the court reporter as well, as

8   everyone else in the courtroom.

9           THE COURT:  You have to answer out loud.

10       A   Yes.

11       Q   (Mr. Huq)  Can you just start off by

12   introducing yourself to the Court?

13       A   Heather Demian.

14           THE COURT:  What's your first name?

15       A   Heather.

16       Q   (Mr. Huq)  Is your last name spelled

17   D-E-M-I-A-N?

18       A   Yeah.  It gets misspelled on some documents.

19   It's capital D-E, space, capital M-I-A-N.

20           THE COURT:  Would you do me a favor?  I can't

21   hear a word you're saying.  You're doing fine.  Can I

22   impose on you to adjust that so that you're closer to me.

23   Mr. Huq will stand at the podium.  He'll keep his voice

24   up.  Thank you very much.  I appreciate that courtesy.

25       Q   (Mr. Huq)  Ms. Demian, is it okay if I call you

1   Heather?

2        A   Yes.

3        Q   Are you an independant journalist?

4        A   Yes.

5        Q   Is there anyplace that we would recognize some

6   of your work?

7        A   I've had photos.  I've had photo credits in the

8   Post-Dispatch, Riverfront Times, the St. Louis American,

9   Newsweek.  CNN has run some of my videos before.  It's not

10   like a regular paid job.  I'm disabled.  I can't work full

11   time.  I take pictures.  I'm a photographer.  I like to

12   take pictures.  I take pictures of newsworthy events.  I

13   tend to document a lot of protests.

14           THE COURT:  You may ask your next question.

15       Q   (Mr. Huq)  Let me ask you this.  How long have

16   you been doing independent journalism?

17       A   I mean I never went to journalism school.  I did

18   work as a reporter on my college newspaper at Mizzou.

19   I've been independently documenting since 2014.

20       Q   You mentioned your disability.  Can you kind of

21   describe that a bit to the Court?  What is it exactly?

22       A   It's called Ehlers-Danlos Syndrome, E-H-L-E-R-S

23   hyphen D-A-N-L-O-S.  It's two Danish doctors' names.  It's

24   a connective tissue disorder.  It's genetic.  I have a

25   collagen defect in -- a collagen gene that has a mutation.

1   It makes my joints dislocate.  It makes my skin fragile.
2   It has some certain effects on my nervous system.  I use
3   the wheelchair, because I try to stand up and my hips and
4   knees and ankles dislocate.  I tend to wear a lot of
5   braces sometimes to help brace my joints.  I tend to
6   dislocate them a lot.
7       Q   Your use of the braces and your use of the
8   wheelchair, is that a result of coping with this
9   disability?
10      A   Right.  I was born with it.  It started
11  manifesting, the symptoms.  I was diagnosed by Dr. Victor
12  McKusick's team at John Hopkins.  He's the father of
13  modern medical genetics.  He diagnosed me at John Hopkins.
14      Q   In other words, you've basically been living
15  with this disability your entire life; is that right?
16      A   Right.  I got my first wheelchair when I was
17  like 11.  I've been using it full time since I was 21.
18  I'm 59 now.
19      Q   Thank you for explaining that to us.  I want to
20  bring your focus now to September 29th, 2017.  Do you
21  remember that date?
22      A   Yes.
23      Q   Do you remember being in downtown St. Louis that
24  evening?
25      A   Yes, I do.

49

1       Q   Can you explain to the Court why you were there
2   that evening?
3       A   There was a big protest outside of ballpark
4   village and the stadium.  I was documenting.  I was live
5   streaming and taking pictures.
6       Q   Is it fair to say that you were there as a
7   journalist?
8       A   Yes.  I had a camera.  I had a tripod with my
9   phone live streaming.  I had a Canon camera.
10      Q   Were you present with the marchers when they
11  went to the ballpark?
12      A   It started out on the west side of the ballpark.
13  Then eventually they went north and up around Kiener Plaza
14  and down between the courthouse and Kiener Plaza.  Is it
15  Broadway?  Between Kiener and the courthouse.  They
16  started going down there, and it goes down to Clark by
17  ballpark village.  They were going back past that.  They
18  kept marching south past ballpark village.  Then people
19  started screaming so I went back.
20      Q   Let's kind of focus to that time period.  You
21  were going along with the marchers at some point.  It
22  sounded like you told the Court that you heard people
23  screaming.
24      A   People behind me started screaming.
25      Q   When people behind you started screaming, what

50

1   were you -- what did you do at that point?
2       A   I turned around, because people started
3   screaming and started running back the way we had been
4   coming from.  I followed them.
5       Q   Did you have your video set up operating at that
6   time?
7       A   Yeah.  I had a big tripod.  It has my phone on
8   top of it that I was live streaming with.  I had my
9   camera.
10      Q   Was the tripod affixed to your wheelchair?
11      A   No.  I was carrying it in my hand.  There's a
12  handle on it.  I can pick it up.  Sometimes I try to
13  balance it on my footrest.  A lot of times I'm carrying
14  it.  It's very hard on my arm.  I overuse my arm a lot.  I
15  use it a lot more than I'm supposed to.
16      Q   In other words, it allowed you to at least put
17  it down at various points so that you can set up and film
18  so to speak?
19      A   Right.  I can set the tripod down, and it would
20  keep going.
21      Q   When you heard the screaming, you turned around
22  to head back the other direction.  What happened after
23  that?
24      A   As we got closer, like people were still
25  screaming.  Wasn't quite sure what was going on.  Somebody

51

1   said that a protester had gotten tasered.  I was asking
2   why.  There are people who have died after being tased.
3           THE COURT:  I didn't hear you.
4           MR. HUQ:  Heather, real quick.
5           THE COURT:  Don't interrupt.  Just repeat your
6   answer, please.
7       A   From what point?
8       Q   (Mr. Huq)  Go ahead and face Judge Clark.  I'll
9   just ask my questions very loudly.  You don't have to
10  look at me.
11      A   From what point?
12          THE COURT:  That's okay.  Just do me a favor.
13  Focus on the question you're being asked and just keep
14  your voice up.  You're doing fine.  Thank you.
15      Q   (Mr. Huq)  You heard screams?
16      A   We heard screams.  I turned back.  I was
17  following them.  As I got closer, people were saying that
18  somebody got tased.  Somebody had been hit with a taser.
19  People have died after being tased.  It can be a
20  potentially lethal weapon.  I asked why are you using that
21  potentially lethal weapon on a protester.  As a
22  journalist, I kind of want to know why this force is being
23  used.  I'm in the middle of asking these questions, and I
24  got hit with the pepper spray.
25      Q   Let me ask you this, Heather.  Who were you

52

1 asking those questions to?

2    A   It was kind of a general the police and officers

3 and crowd that was in front of me.  I was trying to get

4 close enough.  I could see some officers.  I was trying to

5 get close enough to shout my questions.

6    Q   Did you see what those officers were doing at

7 that time?

8    A   By the time I got back, they were already taking

9 back the people that they were arresting.  I was just in

10 the middle of asking a question when I got hit from the

11 side with the pepper spray.

12    Q   Let's kind of focus to that point.  What exactly

13 happened?  You were down there.  You were shouting your

14 questions about what's going on.  Then what happens?

15    A   I got hit with pepper spray.  I wasn't expecting

16 it.  I didn't see anyone at that point.  There had not

17 been a dispersal order or any warnings of any kind.  As a

18 journalist, many journalists have goggles and protective

19 gear if you're going to cover a protest where there could

20 be chemicals.  The police call them chemical munitions.

21    MR. MILLIKAN:  I'm trying to be patient and not

22 object.  There's a lot of narrative.

23    THE COURT:  Sustained.

24    Q   (Mr. Huq)  Heather, let me kind of explain a

25 little bit.  When I ask you a question, just try to

                                                        53

1 focus your answer just to that question.  When you start

2 to answer it in a long kind of way, it's hard for

3 everyone to follow.  That's okay.  You're doing a great

4 job.

5    THE COURT:  Just ask your next question,

6 Mr. Huq.

7    Q   (Mr. Huq)  Yes, sir.  Let me ask you this,

8 Heather.  Did you hear anyone tell you to disperse?

9    A   No.

10    Q   Did you hear anyone tell you to get back?

11    A   No.

12    Q   Did you hear anyone tell you to watch out,

13 because pepper spray was about to be deployed?

14    A   No.

15    Q   What happened when you felt the paper spray on

16 you?

17    A   I screamed.

18    Q   Why?

19    A   Because it was very shocking.  I wasn't

20 expecting it.  I screamed.  It was on the side of my face

21 and my glasses and my arm.

22    Q   What was the immediate effect if any?

23    A   The immediate effect was it on my glasses.

24 I could feel a very, very slight burning in my eyes.  I

25 knew what it was.  Because of my condition, I had a

                                                        54

1 delayed reaction to it.  It was on my glasses.  I couldn't

2 see very well.  I'm just trying to use my camera to take

3 pictures in front of me.

4    Q   You were still operating your still shot camera

5 at that time?

6    A   Yes.

7    Q   Was your video still operating at that time?

8    A   Yes.

9    Q   If you could face the screen a little bit.  Your

10 Honor, this is Exhibit 1 again, Ms. Demian's video.

11    (Whereupon, Exhibit 1 was played.)

12    Q   Is that your video?

13    A   Yes.

14    THE COURT:  I didn't hear you, ma'am.  Did you

15 say yes?

16    A   Yes, it appears to be, yes.  I can barely hear

17 myself.  That's me narrating.

18    Q   (Mr. Huq)  At that point were you heading back

19 toward the direction of the disturbance?

20    A   Yes.  We had been going south.  We turned around

21 and were going north.

22    Q   Is that you asking that question?

23    A   Yes.  I asked them why are you using a

24 potentially lethal weapon on someone, because they had

25 tased a protester.  I was trying to find out why.

                                                        55

1    (Whereupon, Exhibit 1 was played.)

2    Q   Is that you shouting on the video at that point?

3    A   Yes.

4    Q   You were shouting why did you spray me?

5    A   That's the censored version, yes.  I was cursing

6 quite a bit.

7    Q   It sounded like it took you by surprise.  Is

8 that accurate?

9    A   Yes.

10    Q   You mentioned being blinded initially.  Did you

11 have your glasses on at that time?

12    A   No.  The pepper spray it's an orange oily

13 substance.  It got on my glasses.  I can see about this

14 far without my glasses.  Everything past here is just

15 blurrier.  I can see shapes and colors.

16    Q   Six inches out you really can't see that wall

17 without your glasses.  Is that what you're saying?

18    A   Past 10 inches.

19    Q   After you got sprayed, what did you do?

20    A   Well, I was trying to get my glasses off,

21 because I knew there was pepper spray.  I was kind of

22 trying to figure out what to do.  I'm not sure exactly how

23 long it took.  I know some medics came up to me at one

24 point and started washing it off my skin.

25    Q   Were you still snapping photos at that time?

                                                        56

1      A    Yes.

2      MR. HUQ:  I'm showing Mr. Millikan what's been

3  marked as State's Exhibit 5 and 6.  Your Honor, these also

4  have been stipulated to as far as their authenticity.  May

5  I approach the witness?

6      THE COURT:  You may.

7      Q    (Mr. Huq)  Thank you.  Heather, I'm handing you

8  what's been marked as State's Exhibit 5 and 6.  Are you

9  able to hang on to these?

10     A    Sure.  Sorry.

11     Q    Are those the photos that you took?

12     A    Yes.  Those are two of my photos.

13     Q    Is that immediately after you were sprayed with

14  the pepper fogger?

15     A    Right.  You could see a few seconds after I

16  scream.  They come into my field of view.  I lifted my

17  camera up and took still shots.  These pictures were taken

18  at this point in this video.

19     MR. HUQ:  Your Honor, would you like to see

20  these copies?

21     THE COURT:  Fine.

22     Q    (Mr. Huq)  Beyond asking the questions that you

23  were when you first approached that scene and before you

24  got sprayed, were you making any threats to anybody?

25     A    No.

57

1      Q    Were you making any physical nonverbal threats

2  to anybody?

3      A    No, I wasn't.

4      Q    The medics began to kind of clean you off, the

5  pepper spray off of you?

6      A    Yes.

7      Q    Did you have any lasting effects?  When I say

8  lasting, I mean beyond just the immediate.

9      A    Part of my condition is certain — like my skin

10  doesn't — the collagen in my skin reacts differently to

11  chemicals than someone might normally react to.  Like

12  local anesthetics they don't generally work on me much at

13  all.  It could be related to — when the pepper spray hit

14  my skin, it did not burn.  I could see it on my skin.

15  Where there were large globs of it the medics washed it

16  off.  Over time until I could get home, several hours

17  before I could get home to take a bath, by that point it

18  sat on my skin.  Even though I could not actively feel it

19  burning, it eventually became like a sunburn.  I tried to

20  take a tepid bath.  Even with just tepid water, it was

21  burning.  The primary immediate reaction or within like

22  the first five to 10 minutes during the first immediately

23  right after it happened, mostly my eyes and my mouth is

24  where it burned the most.  Mostly my eyes.  I had a medic

25  that was washing my eyes.

58

1      Q    Tell me if this is an accurate summary.  You're

2  saying that immediately you had burning around your face

3  and eyes?

4      A    It took a few minutes for it to kick in.  It

5  wasn't like a split second that it hit.  It was enough of

6  a feeling that I could tell that it was pepper spray.  My

7  eyes didn't start burning really badly until several

8  minutes.

9      Q    When you got home later, the effects —

10     A    Because the parts of my skin that — the parts

11  of my skin that the medics hadn't washed, because there

12  weren't obvious globs of oil there, because the pepper

13  spray was a fine mist.  It sat on my skin and it

14  physically damaged the skin like a sunburn without me

15  feeling it until it was already burned.

16     Q    At some point as you were washing it off at

17  home, you could feel pain?

18     A    When I tried to get in the bath — at that point

19  by the time I was able to get into the bath, the skin had

20  turned red.  It took several days.  It was like a bad

21  sunburn.

22     Q    Did any of the spray get on the wheelchair that

23  you were using that night?

24     A    Yeah.  It still smells like pepper spray.  My

25  landlord can smell it.  I'm waiting for new batteries.  I

59

1  would have been in that chair.

2      Q    This chair is not —

3      A    This is not the chair I was in at the time.

4      Q    The question I want to ask you now, Heather, is

5  it true that you filed a lawsuit with respect to this

6  incident?

7      A    Yes.

8      Q    Why did you file that lawsuit?

9      A    Because I have a first amendment right as a

10  journalist to ask questions without being assaulted.

11     MR. HUQ:  Give me one second, please.  I don't

12  have any further questions at this time, Your Honor.

13     MR. MILLIKAN:  No questions, Judge.

14     THE COURT:  Thank you.  May this witness be

15  excused?

16     MR. HUQ:  Yes, sir.

17     MR. MILLIKAN:  Yes, Judge.

18     THE COURT:  Thank you, ma'am.  You're off

19  subpoena.  Thank you.  You may call your next witness.

20     MR. ESTES:  Thank you, Your Honor.  Rasheen

21  Aldridge.

22

23

24

25

60

1        *RASHEEN ALDRIDGE,*
2  having been first duly sworn by the deputy clerk, testified:
3              DIRECT EXAMINATION
4  QUESTIONS BY MR. ESTES:
5       Q    Could you state your name for the record,
6  please, sir?
7       A    Rasheen Lamont Aldridge, Junior.
8       Q    How are you employed, sir?
9       A    I'm currently the state rep of the 78th
10  District.  I'm employed by the State of Missouri.
11       Q    How long have you been the representative?
12       A    Going on two years now.
13       Q    How were you employed back in 2017?
14       A    2017.  With SEIU.  It was a labor organization
15  service employee union.
16       Q    Did you take part in any of the protests
17  following the Stockley verdict back in 2017?
18       A    I did.
19       Q    How did you get involved in those?
20       A    I was involved in the Stockley verdict, because
21  I was heavily involved in the Ferguson movement back in
22  2014.  After the death of Anthony Lamar Smith in the
23  Stockley verdict, several of the activists involved in the
24  Ferguson movement started organizing around that.  I was
25  one of the — I wouldn't say I was the main organizer.  I

61

1  would be one of the people that would come out and support
2  protests.  I was using the loud mouth bullhorn to try to
3  make sure that people were safe.  It was a continuation of
4  the movement from Ferguson.
5       Q    Is the movement still together?
6       A    Yes.  Just this past couple months after the
7  death of Breonna Taylor, I was one of the lead organizers
8  in George Floyd leading the protest in the city and
9  county, St. Charles and the capital.
10       Q    Was the Ferguson incident how you got involved
11  in being an activist?
12       A    I wouldn't say that Ferguson was.  I was already
13  involved in the neighborhood when I was young.  My mom
14  used to be involved politically with helping out former
15  Alderwoman April Brickman.  After high school I wanted to
16  make a difference in my community, but didn't know how.  I
17  got plugged in with different organizations like Justice,
18  SEIU.  Did a lot of minimum wage increase work to try to
19  allow people to increase their minimum wage but also to
20  have a union.  That energy shifted in 2014 when the death
21  of Michael Brown happened.
22       Q    Specifically let's talk now about what happened
23  September 29th.  Were you involved in the protest that
24  night?
25       A    I was.

62

1       Q    What was your role, sir?
2       A    Typically my role in most protests, like I said,
3  I usually have the bullhorn.  I'm the guy that keeps the
4  energy going.  One of the leaders that try to make sure
5  that people are safe.  Making sure that the protests —
6  not saying it's controlled, because you can't necessarily.
7  People are protesting because they're angry.  But to make
8  sure that the energy is channeled in the right way.  My
9  role was to, like I said, keep the chants going, keep the
10  energy going, but also kind of be a — not a medic.  Kind
11  of a street watcher to make sure the protest was safe.
12       Q    You mentioned the right way.  What did you mean
13  by the right way?
14       A    Again, if you look at civil rights history and
15  you look at protests throughout this country, there's
16  really no right way.  People are angry.  People are upset.
17  I would say my role was to make sure that that energy is
18  channeled in a way that is constructive that don't lose
19  our message.  We've seen protests that I've been part of,
20  and then afterwards other people kind of highjack it or
21  take advantage of it.  Really making sure that the energy
22  that we're putting into it and all the hard work
23  organizing for it is not being diluted by anger that can
24  be steered somewhere else that's not constructive in a way
25  to try to get a message across.

63

1       Q    You said organized.  Was this an organized
2  protest?
3       A    Yes.  Most of the protests during the Stockley
4  verdict and just recently are all organized.  You're
5  talking about people, like I say, that's been involved in
6  the Ferguson movement that come together and say, hey,
7  we're going to plan this action.  They're not just we're
8  going to the streets.  Each action usually have a message
9  behind it.  If it's the blue tape on the mouth or going to
10  Busch Stadium to let people know that enjoy sports.  Also,
11  the Cardinals really is an influential organization in the
12  city.  Letting them know or taking that concern to
13  different parts of the area instead of just staying in St.
14  Louis.  Sometimes we go to the county.  Like I say, all of
15  them are organized.  We have people that play a certain
16  role.  Again, loud mouth or like Reverend Gray who is a
17  reverend that played that safe protection role lookout.
18  Other people that kind of give talks during the time.
19  It's all organized from start to finish.
20       Q    Were you one of the organizers?
21       A    I was not one of the planned organizers.  I was
22  one of the supporters of organizing.  I wasn't — back in
23  '17 I wasn't an organizer like I was now.  In ' 17 any
24  time there was an action, I would show up and figure out a
25  way I could be supportive.  Still now Congresswoman Cori

64

1   Bush and many others that were organizing the actions, and
2   I would be a support role to make sure that whatever loose
3   ends that were needed that I could help step up.
4       Q    How were you supporting specifically on
5   September 29th, 2017?
6       A    Back in September I was supporting, like I said,
7   mainly just chanting.  There's moments at the beginning of
8   the protest like in September where we don't take off.  We
9   kind of gather and we wait for people to get there.  All
10  of our posts are public.  People who want to come to these
11  actions can see it.  We start at like six.  We usually
12  don't take off until like 6:30, 6:45.  My role is keep the
13  energy going, dancing, keeping the chants.  Once the
14  protest took off, we walk around a little bit again just
15  to keep the energy high.  At the same time watching out to
16  make sure that people are safe, because we do have
17  individuals who are parents who have their kids that want
18  to experience this that feel like what happened is an
19  injustice.  The last thing we want is somebody to get
20  hurt.  That's the main reason that we're out there.
21      Q    You mentioned chants.  You were leading chants.
22  Can you say what you were saying?
23      A    Yeah.  Mainly like no justice, no peace.  Whose
24  streets?  Our streets.  Everywhere we go the people want
25  to know who we are.  We are the people, the mighty, mighty

1   people.  Fight for our freedom.  Just the typical chants
2   that you would see that we've seen in the last couple of
3   years in the St. Louis area.
4       Q    Did anything happen out of the extraordinary
5   during this protest?
6       A    Yes.  We started the protest.  We wait a little
7   bit to let everyone get there.  As we was waiting, like
8   most of the time, even though we don't directly
9   communicate with law enforcement to say, hey, this is
10  where we're going, there is some level of communication
11  and understanding.  It's like an unspoken — I wouldn't
12  say like code of conduct between protesters and law
13  enforcement.  The street was already blocked off right
14  there like at Cicero's right behind us.  So we chanted
15  around that area.  Eventually we end up going down on
16  Broadway.  As we went down Broadway, everything was
17  normal.  Just typical walking down the streets.  Most of
18  the time there's police blocking or traffic cops blocking
19  the side, maybe some in the back that's blocking so no
20  cars come through.  As we continued to walk down Broadway,
21  the protest was split up into kind of like three sections.
22      Q    What section were you in?
23      A    I would say I was like in the middle section.
24  The majority of the protest crowd was in the front.  There
25  was most likely a leader like Chan or somebody who has

1   been part of the protest like leading in the front.  The
2   majority of the crowd was up front heading to Broadway and
3   Clark.  I was towards the middle, and then you have
4   Reverend Gray, Cap, maybe a couple of stragglers.  I think
5   Amir in the very back.
6       Q    Why would he be in the very back?
7       A    Again, Reverend Gray is usually kind of the
8   safety net.  If anything happens like say a car is coming,
9   he kind of want to put his body on the line.  Even though
10  we have police blocking it off, there's still a sense that
11  someone who doesn't have trust in law enforcement keeping
12  us safe.  He was in the back.  As we continued to walk,
13  probably as the crowd got halfway to Clark or just a
14  little bit to Clark, I had heard like some commotion in
15  the back.
16      Q    What did you do in response to that?
17      A    I turned around.  When I turned around, that's
18  when I seen Cap, which we call him Kevin.  I call him Cap.
19  Was being tased by a police officer which is usually
20  uncommon.  I have not — since the protests I've been part
21  of from George Floyd to Ferguson, no protester has been
22  tased that I've seen.  There have been arrests.  There
23  have been chemical agents.  Not to the point where —
24          MR. MILLIKAN:  Your Honor, I'm going to object
25  to the relevance of whether or not a police officer or

1   protester had been tased in prior incidents or protests.
2          THE COURT:  Overruled as to relevance.
3       Q    (Mr. Estes)  Go ahead and finish what you were
4   saying.
5       A    Kind of lost my train of thought.  Again, like I
6   was saying, when I turned around, I seen Cap get tased.
7   We have never seen any of that happen in the last five
8   years.  So it threw me off.  It shocked me.  Cap is a big
9   guy.  He's usually also one of the —
10         THE COURT:  I'm sorry for interrupting.  Are you
11  saying cap or cat?
12      A    Cap is his name.  I think Kevin.
13      Q    (Mr. Estes)  I think it's Calvin Kennedy.
14      A    Calvin is his government name.  We call him Cap,
15  Judge.
16         THE COURT:  Thank you.
17      Q    (Mr. Estes)  What did you do in response to the
18  tasing?
19      A    When Cap had got tased, instantly I just started
20  asking questions.  What happened?  Why did he get tased?
21  What was the reason?  Again, this has never happened.
22  This protest was honestly a low level protest.  We wasn't
23  like on the highway.  We weren't confronting law
24  enforcement.  We was walking, and he got tased.  I turned
25  around and was just asking questions.  I'm assuming he was

1  a captain.  He's the chief of police now.  Hayden.  I
2  don't know his position in the past.  Was asking him
3  questions like what happened.  He didn't seem to know.
4  Literally just kept asking why.  Why did you guys tase
5  him?  What happened?  What was the point?  We had to get
6  through Cap being tased.  As Cap was walking back, there
7  was a space between me and the police.  Plenty — there's
8  been other times where we've been closer, literally face
9  to face.  There was a nice space between police as Cap was
10  walking back.  I started walking back asking what
11  happened.  What happened?
12        Q    Who were you with at that time?
13        A    At that time I was by myself.  Eventually Amir.
14  When Cap got tased, I was by myself.  As we walked back to
15  address the police, Amir was on my left side.  We both
16  were asking questions why.  Shortly after that it went
17  from asking what happened to unexpectedly being hit with
18  mace by Officer Olsten.
19        Q    Describe how that happened.  How did that come
20  about?
21        A    Honestly it was a shocker.  I've been hit with
22  mace and at least told that, hey, this is an unlawful
23  protest.  If you don't move, you will be arrested.  If you
24  don't move, you'll be hit with mace.  As I was asking the
25  question why, I don't know if I was directly asking Olsten

1  at the time or just speaking in general.  As I was
2  standing there asking the question why, literally in
3  seconds Officer Olsten pulled his mace or pepper spray,
4  whatever the proper term is, and sprayed me directly in
5  the eye, this left eye.  I know that, because still to
6  this day, if my eye gets a little watery, it burns and
7  waters more than usual.  This eye is fine.  Directly in
8  the eye.  All across my face.  Turned around.  All down my
9  back.  Was just completely thrown off to what had risen to
10  the level of chemical agents being used at a lawful
11  protest.
12        Q    Did you get any treatment for it?
13        A    No.
14        Q    At the scene?
15        A    At the scene I did.  At the scene, I could not
16  see.  Some faith leaders walked me over to the sidewalk.
17  Clearly I'm just rubbing my eyes, using my shirt.
18  Probably not the best thing to do to mix it all in.  Faith
19  leaders moved me over to the side.  Also having a
20  prosthetic making sure that I'm stable.  Put me down on
21  the ground.  Used Maalox or milk and water is what we used
22  to kind of get the stuff off of me.  From there some
23  random person hopped in the car with another protester
24  that took me home where my girlfriend at the time put me
25  in the shower and, you know, treated me for it trying to

1  get it off.  I think water is probably not the best.  It
2  only burned more even into the next day.  I didn't receive
3  any — I didn't go to the hospital.  I did receive
4  treatment on the scene.
5        MR. ESTES:  I'd like to show the witness State's
6  Exhibit  No. 7, Your Honor.
7        THE COURT:  Thank you.
8        Q    (Mr. Estes)  Photograph.
9        A    Yeah.  I remember that.  This was at the corner
10  of Broadway and Clark.  If you're going south on Broadway,
11  right to your left right before you get to this garage,
12  two of the pastors, Pastor John and then another pastor,
13  was helping me with the milk to kind of get myself
14  together.  It burned not just my eyes but even all over my
15  arm, all across my back.
16        MR. ESTES:  Your Honor, I'd move pursuant to our
17  stipulation for the admission of No. 7, State's Exhibit 7.
18        MR. MILLIKAN:  No objection.
19        THE COURT:  7 is admitted.
20        MR. ESTES:  May I publish it to the Court?
21        THE COURT:  Thank you.
22        Q    (Mr. Estes)  You mentioned a prosthetic.  Do
23  you have a prosthetic limb?
24        A    I have a loss of a limb.  I wear a full-length
25  prosthetic.  Ever since I was born, I didn't get proper

1  blood flow in the right side of my leg.  The right side of
2  my leg is shorter than the left side.  My right side stops
3  a little below my knee, a little above my shin.  I've been
4  having it my whole life.
5        Q    Now, you mentioned you didn't go to the
6  hospital.  Why didn't you go to the hospital?
7        A    At that time I don't think I probably had
8  insurance.  I thought it would have just been easier to
9  self medic myself.  If I would have known to this day that
10  I'd been having an eye issue, I probably would have went.
11  I just looked at it as another moment of being in the
12  protest.  I regret not going to the hospital now.
13        Q    Let's look back a little bit.  You mentioned
14  getting tased.  Did you see who did that to you?
15        A    I didn't get tased.  Cap got tased.
16        Q    Did you see who pepper sprayed you?
17        A    Officer Olsten.  Officer Olsten.
18        Q    Do you see him in the courtroom?
19        A    Yes.
20        Q    Can you point him out to the Court and describe
21  what he's wearing?
22        A    Gentleman on the table over there.  I'm a little
23  colorblind.  I'm assuming black with a bow tie yellow,
24  white guy.
25        Q    Were you doing anything to pose a threat to

1   Officer Olsten or anyone else?
2       A    Not at all.  I've been at protests with Officer
3   Olsten in the past just like with other officers.  With
4   being a smaller guy with a prosthetic, I'm not one of
5   those ones that is displaying a threat.  Usually, if
6   anything, I would try to talk to law enforcement.  I was
7   not being aggressive.  I was not cursing.  I wasn't
8   physically reaching at all.  I was just asking questions
9   of why, what happened, and then turned around and was hit
10  with mace.
11      Q    Did anyone give you any verbal commands?
12      A    Not at all.  I've been part of protests.  This
13  protest at the time was not even called unlawful.  It was
14  a lawful protest.  We were literally walking down the
15  street to Busch Stadium.  Usually when there's an unlawful
16  protest, you can expect, if you don't leave as a
17  protestor, maybe mace, or maybe arrest, or tear gas,
18  something to get the people out of the area, because the
19  protest was not lawful.  This was not called unlawful.
20  There was no warning of mace being used.  There was no
21  warning, if you don't step back, I'm going to use mace.
22  It literally was within seconds just pulled out and hit
23  all across the face.
24      Q    Did you see what Officer Olsten was doing before
25  this happened?

73

1       A    I think he was one of the officers escorting Cap
2   back.  Cap had got, like I say, tased.  They detained him
3   and escorted him back.  As they were escorting him back,
4   Officer Olsten, who was one of the officers escorting him
5   back, kind of like dropped him off and then proceeded back
6   to us.  Maybe within seconds, literally less than a
7   minute, I could tell you that, from him dropping off Cap
8   and walking to us was when we were hit with pepper spray.
9       Q    How far away was he when he started heading back
10  towards you?
11      A    We did a walk up on Broadway.  I kept saying
12  Clark.  On Broadway they kind of had a police station
13  right at the hotel, whatever that street is.  We didn't
14  get that close to law enforcement.  That was kind of like
15  their staging area if you want to call it where they had
16  cops.  We didn't get that close to them.  If anything, he
17  started to — after dropping off Cap, he came closer to
18  us.  That's when literally we was probably a foot away
19  from each other when the chemical agents was released.
20      Q    Do you recall exactly where you were standing?
21      A    I was standing in the middle of Broadway
22  probably a little bit before not Clark Street, but there's
23  a hotel.  There's a side street right there.  Just a
24  little bit after that street side on Broadway.
25      Q    Do you think it was maybe Walnut?

74

1       A    If that's the street, yes.  It was a little
2   after Walnut and Broadway literally just not that far.
3   Right by Busch Stadium's big sign in the middle of the
4   street, ballpark village.
5       Q    Finally, were you involved in a lawsuit?  Did
6   you file suit over this?
7       A    Yes.
8       Q    Why did you file suit?
9       A    For me it's about fairness and accountability.
10  Again, somebody being involved in a lot of protests going
11  back to Ferguson, which was a lot more extreme than this,
12  and having a relationship with law enforcement from the
13  tasing to the slamming of an individual to myself.  Maybe
14  because I feel like I'm the smallest kind of guy.
15  Literally I'm not one of the most aggressive protesters.
16  To be hit with mace was frustrating.  It was traumatizing.
17  It needs to be some accountability especially after the
18  ACLU said those type of chemical agents was not right to
19  be used on protesters.
20      Q    Have you seen any videos?
21      A    Too many times than I would like to see, but
22  yes.
23      Q    Go ahead and play the Maverick.  Your Honor,
24  this is again from Exhibit 1.  It's the Maverick.
25          (Whereupon, Exhibit 1 was played.)

75

1       Q    (Mr. Estes)  Who were the first two gentleman
2   that were shown?
3       A    Reverend Gray, Reverend Darryl Gray, and Amir.
4   I'm not sure of his last name.
5       Q    Do you know who this officer is that's shown
6   right now?
7       A    Can't see with the fuzzy.  Don't know.
8          (Whereupon, Exhibit 1 was played.)
9       Q    Who is that?
10      A    That's Amir.  This was, again, the back of the
11  protest.  They were in the very back.  The rest of the
12  protesters have proceeded on without them.
13      Q    Most of it was past this point?
14      A    Way past this point.
15      Q    Go ahead.
16          (Whereupon, Exhibit 1 was played.)
17      Q    Who is that getting thrown to the ground?
18      A    That's Reverend Darryl Gray being thrown to the
19  ground.
20          (Whereupon, Exhibit 1 was played.)
21      Q    Who is that that the police were interacting
22  with?
23      A    That's Cap in a black top, black pants.
24      Q    Were you actually there at this point?
25      A    I was a little bit — you're going to see me in

76

**Page 77**

1  the red shirt.  I was a little bit -- what is that --
2  south of Cap maybe literally like 30 feet.
3     Q   Were those the two events that were bringing you
4  back?
5     A   I actually didn't see what happened to Reverend
6  Gray.  What really got my attention is when -- you heard
7  the commotion.  The taser.  I know what the taser sounds
8  like.  That's what had really got my attention to proceed
9  going northbound.
10    Q   You came back because of the sound of the taser?
11    A   Correct.
12    Q   Go ahead and play it.
13        (Whereupon, Exhibit 1 was played.)
14    A   I think that's me in that red shirt.  I was just
15  a little bit where that gentleman is, a little bit there
16  coming back northbound.
17        (Whereupon, Exhibit 1 was played.)
18    Q   What's happening now?
19    A   Olsten and other officers are taking Cap
20  northbound.  Taking Cap to detain him northbound on
21  Broadway and Walnut.
22    Q   Roll it.
23        (Whereupon, Exhibit 1 was played.)
24    Q   Who is that with Mr. Brandy?
25    A   That's me.

**Page 78**

1         (Whereupon, Exhibit 1 was played.)
2     Q   Who is that?
3     A   Officer Olsten.
4         (Whereupon, Exhibit 1 was played.)
5     MR. ESTES:  No further questions, Your Honor.
6     THE COURT:  Thank you.
7              CROSS-EXAMINATION
8  QUESTIONS BY MR. MILLIKAN:
9     Q   Mr. Aldridge, you were standing directly next to
10  Amir Brandy, were you not?
11    A   Yes.
12    Q   When the macing occurred?
13    A   Yes, sir.
14    Q   Mr. Brandy was telling Mr. Olsten that he was
15  going to fuck him up, correct?
16    A   Correct.
17    MR. MILLIKAN:  Nothing further.
18    MR. ESTES:  Your Honor, at this point I would
19  move for the admission of all of my exhibits.
20    THE COURT:  Before we do that, do you have any
21  more questions for Representative Aldridge?
22    MR. ESTES:  No, I do not.
23    THE COURT:  May this witness be excused?
24    MR. ESTES:  Yes.
25    MR. MILLIKAN:  Yes, Judge.

**Page 79**

1         THE COURT:  You're off subpoena.  Thank you,
2  sir.  Sorry for interrupting, Mr. Estes.  You may proceed.
3     MR. ESTES:  I move for the admission of
4  Exhibit 1 which contains the two videos, the Demian video
5  and the Maverick video.  Exhibit 2 which is the evidence
6  envelope, and 2-A which is the RTCC video.  Exhibit 3 was
7  the special operations on the use of force.  We did not
8  use Exhibit 4.  5 through 10 are photographs.
9     THE COURT:  I'm showing 7 through 11 have
10  already been admitted.  You're asking for the admission of
11  1, 2, 2-A, 3, 5 and 6; is that true?
12    MR. ESTES:  Yes.
13    THE COURT:  You're withdrawing any interest in
14  admitting Exhibit 4?
15    MR. ESTES:  Yeah.
16    THE COURT:  Any objection to that?
17    MR. MILLIKAN:  No, Judge.
18    THE COURT:  Exhibits 1, 2, 2-A, 3, 5 and 6 are
19  all admitted at this time without objection from the
20  defendant.
21    MR. ESTES:  With that the state rests, Your
22  Honor.
23              STATE RESTS
24
25

**Page 80**

1         THE COURT:  Thank you.  Mr. Millikan, do you
2  wish to make a motion at this time?
3     MR. MILLIKAN:  Yes, Judge, I do have a motion
4  for judgment of acquittal at the end of the state's case.
5  May I approach, Judge?
6     THE COURT:  Thank you.
7     MR. MILLIKAN:  I don't have any particular
8  argument, Judge.
9     THE COURT:  Let the record reflect that
10  defendant's motion for judgment of acquittal at the close
11  of state's evidence is denied at this time.  Off the
12  record.
13        (There was a discussion off the record.)
14    THE COURT:  Let's go ahead and take a luncheon
15  recess.  We'll reconvene at 1:00.
16        (A recess was taken.)
17    THE COURT:  Hearing that the state has rested
18  and the Court has denied your motion for judgment of
19  acquittal at the close of the state's evidence,
20  Mr. Millikan, does the defendant wish to make an opening
21  at this time?
22    MR. MILLIKAN:  No, Your Honor.  We waive
23  opening.
24
25

1    THE COURT: Thank you. You may proceed.

2    DEFENDANT'S EVIDENCE

3    MR. MILLIKAN: Thank you, Judge. I call

4  Sergeant Eric Bartlett.

5    ERIC BARTLETT,

6  having been first duly sworn by the deputy clerk, testified:

7  QUESTIONS BY MR. MILLIKAN:

8    MR. HUQ: I will be cross-examining Sergeant

9  Bartlett. So any objections will be coming from my side.

10    THE COURT: You may inquire.

11    Q    Thank you, Judge. Can you state your name,

12  please?

13    A    My name is Eric Bartlett.

14    Q    How are you employed?

15    A    I'm a sergeant with the St. Louis Police

16  Department.

17    Q    How long have you been employed by the St. Louis

18  Police Department?

19    A    28 years.

20    Q    How long have you been a sergeant?

21    A    Eight years.

22    Q    What are your responsibilities and duties as a

23  sergeant?

24    A    I supervise -- right now I supervise detectives.

25  I'm a detective sergeant. I supervise detectives. Make

81

1  sure they get their cases done and other various things.

2    Q    As a sergeant do you have to review the use of

3  force policy on occasion?

4    A    Yes, I do.

5    Q    How often?

6    A    Once a month.

7    Q    Do sergeants just do that or do police officers

8  as well?

9    A    Sergeants and police officers.

10    Q    So you have to review it once a month. Is there

11  anything you have to do with the use of force policy when

12  you review it?

13    A    We review it and we actually take a small

14  multiple choice test.

15    Q    Are you familiar with the use of force policy

16  and what it states?

17    A    Yes, I am.

18    Q    Have you had a chance to review that policy

19  before coming in to testify?

20    A    Yes, I have.

21    Q    We've gone through that policy. I'm not going

22  to do that with you here today. I do want to ask do you

23  know the difference between pepper mace that an officer

24  carries on his or her belt and pepper mace fogger we've

25  heard about today?

82

1    A    Yes, I do.

2    Q    Tell the Court what the difference is.

3    A    The difference is the one you carry on your belt

4  it's for personal use. That's for controlling maybe just

5  one, two, even three subjects. The fogger is for

6  controlling the large group, large crowd, unruly crowd.

7  It covers a larger area.

8    Q    Is there more mace in that canister?

9    A    No. In volume it is. For the potency it's not.

10    Q    I just meant volume.

11    A    More volume, yes.

12    Q    Is it a broader stream?

13    A    Yes, it is.

14    Q    I guess that's why they call it a fogger,

15  because it's more like fog?

16    A    That's correct.

17    Q    The use of that fogger -- is that also covered

18  under the use of force policy?

19    A    Yes, it is.

20    Q    Covering mace?

21    A    Yes.

22    Q    You said they're used for larger crowds?

23    A    Yes, larger crowds, unruly crowds.

24    Q    Would the fogger then be used or carried at

25  least when you're patrolling for protests?

83

1    A    Yes. Every time we're patrolling for protests,

2  we're issued foggers.

3    Q    I want to turn your attention to September 29th,

4  2017. Do you recall a protest on that day?

5    A    Yes, I do.

6    Q    Did you work that protest?

7    A    Yes, I did.

8    Q    Did you work the protest after the Jason

9  Stockley verdict which was entered on September 15, 2017?

10    A    Yes, I did.

11    Q    This wasn't the first protest you worked?

12    A    No. I worked numerous protests.

13    Q    Do you know whether or not prior or leading up

14  to this September 29th, 2017, were there injuries

15  sustained by officers in the protests leading up to that?

16    MR. HUQ: Objection. Relevance, Your Honor.

17    THE COURT: Overruled.

18    A    Yes. Officers were injured in the protest.

19    Q    (Mr. Millikan) Can you tell me a little bit

20  about what you recall about the beginning of that

21  protest on September 29th, 2017?

22    A    The beginning of the protest a large crowd came

23  down by Busch Stadium. They were blocking the streets and

24  causing traffic not to go through, metro buses and trucks.

25  All traffic had stopped. Our commanders allow them --

84

1    Q    Let me stop you there.  You said we.  You are
2  supervising a group of officers that night?
3    A    Yes, I had 10 to 12 detectives that was working
4  for me.
5    Q    Was Mr. Olsten one of those policemen you were
6  supervising that night?
7    A    Yes, he was.
8    Q    Just for the court reporter, make sure I can
9  finish my questions, because it's easier for her to take
10  down the answer.  You recall having 10 to 12 officers that
11  you were supervising that night?
12    A    Yes.
13    Q    Where were you all located that night?
14    A    Our location was Broadway and Chestnut.
15    Q    What, if anything, occurred at Broadway and
16  Chestnut that evening?
17    A    The traffic was being blocked right there at
18  Chestnut going eastbound on to -- passing Broadway.  Once
19  the crowd moved past that location, I personally went into
20  the streets.  There was two ladies blocking the traffic.
21    Q    Let me stop you there.  I just want to make sure
22  we're talking about the same location, because you're
23  saying Chestnut.
24    A    It should be Walnut.  Walnut.  I'm sorry.  I'm
25  getting those two mixed up.

85

1    Q    That's okay.  Go ahead.
2    A    Right there at Walnut and Broadway.  There was
3  two ladies blocking the intersection.  We had multiple
4  cars backed up, people blowing their horns and trying to
5  get through.  There was only maybe five or six travelers
6  still coming up the street moving slow.
7    Q    What did you do then?
8    A    At that time I instructed them to get on the
9  sidewalk.  I told the traffic to go through.
10    Q    That's a decision you made?
11    A    That's a decision I made.
12    Q    Again, why did you make that decision?
13    A    For safety.  Because the people -- traffic was
14  getting unruly.  I didn't want the people stuck in
15  traffic.
16    Q    When you made that decision, what do you recall
17  happening after that?
18    A    After I made that decision, I was in the process
19  of moving the ladies out of the street.  A gentleman came
20  up from behind and pushed one of my detectives.
21    Q    Let me stop you.  When you say a gentleman, do
22  we know who this gentleman was?
23    A    Yes.  I learned later his last name was Gray.
24  Minister Gray.
25    Q    Who was the officer that he pushed?

86

1    A    Detective Vaughn.
2    Q    What happened after you observed that?
3    A    After that, he pushed detective -- Detective
4  Vaughn tried to stop him.  He pushed Detective Vaughn in
5  the chest, and Detective Vaughn fell to the ground.
6    Q    What did you observe next?
7    A    Next Mr. Gray was taken into custody.  I believe
8  he was maced.  He was taken into custody at that time.
9    Q    What, if anything, happened after Mr. Gray was
10  taken into custody?
11    A    While he was being taken into custody, there was
12  another gentleman.  I do not know his name.  Came up and
13  started trying to grab one of my detectives, trying to
14  grab him away from Mr. Gray.  He was assaulting by
15  punching him and pushing on him.  When he tried to subdue
16  him, he took off running and he was tased.
17    Q    When you say he took off running, which way did
18  he run?
19    A    He ran southbound on Broadway towards the crowd.
20    Q    Away from Walnut?
21    A    Yes.
22    Q    Where is the main part of the crowd at this
23  point?
24    A    The main part of the crowd is south of our
25  location on Walnut.  South of our location.  More than

87

1  halfway from where he was taken into custody.
2    Q    Once this occurred with the second subject and
3  he was tased, what, if anything, did the crowd do?
4    A    The crowd began to scream and yell and run back
5  north on Broadway towards our location.
6    Q    As the officers took the second subject into
7  custody, did you hear them give the crowd any commands?
8    A    Yes.  As the crowd got closer, I heard numerous
9  detectives' commandments get back.
10    Q    You've had an opportunity to watch the videos
11  that were taken of this incident; is that right?
12    A    That's correct.
13    Q    You did that at the circuit attorney's office?
14    A    That's correct.
15    Q    Did you hear any commands when you watched the
16  video?
17    A    Yes, I did.
18    Q    What were those commands that you heard?
19    A    Get back repeated numerous times.
20    Q    Were they getting back at that point?
21    A    No.  They continued to come forward.
22    Q    Do you recall if Mr. Olsten was involved in the
23  tasing and taking that second subject into custody?
24    A    He was up towards the way, but he wasn't
25  involved in physically taking him into custody.  No, he

88

1  wasn't.
2     Q    As they bring that second subject back, tell me
3  what happens next.
4     A    As they bring the second subject back, we had
5  subjects throwing water bottles and other objects at us.
6  A subject came up in a very aggressive manner.  I don't
7  know his name.  He came up and was yelling threats at
8  Detective Olsten.
9     Q    Let me stop you there.  What I want to get a
10  feel for is how many people now are coming to your
11  location?
12     A    The crowd -- after they observed everything that
13  was going on, it seemed like the whole crowd turned their
14  tides from Busch Stadium and started coming back towards
15  us.  So the whole crowd that was out there started coming
16  back towards us.
17     Q    How would you describe the crowd at this point?
18     A    The crowd was very angry.  They was very angry.
19     Q    What were you thinking at this point in time?
20     A    At this point I thought we were going to be
21  overrun.  We had traffic to our back and these people
22  coming towards us.  I thought we was going to be overrun.
23     Q    When you say you had traffic to your back, why
24  was that important?
25     A    Because we opened the traffic up.  All the

89

1     protesters had passed that point.
2     Q    My question is, if there's traffic, why do you
3  say there was traffic behind us?  Why was that important?
4  Did it restrict?
5     A    It restricted -- if we wanted to retreat, we
6  could possibly be run over by cars.  Protesters could be
7  run over by cars.  Our main concern was the safety of the
8  officers, the safety of the protesters, and the safety of
9  the subject that we took into custody.
10     Q    You mentioned the word retreat.  Do you, as
11  police officers, have a duty to retreat in those
12  situations?
13     A    It goes by situations.  If it's more safe for us
14  to retreat, then we retreat.  If we can stand our ground,
15  we stand our ground.
16     Q    In this situation you couldn't retreat?
17     A    No, we couldn't.  So we had to stand our ground.
18     Q    At the point where Mr. Olsten -- is Mr. Olsten
19  now involved in bringing that second subject back to
20  Walnut where all the other officers were standing?
21     A    He was actually walking backwards and kind of
22  making sure that the officers were taking the subject into
23  custody they were covered also.
24     Q    What did you observe at that point when you get
25  back to Walnut and Broadway with the second subject?

90

1     A    I saw the crowd coming towards us.  They were
2  coming on the sides.  They was coming from the front.
3     Q    About how many people can you tell us -- about
4  how many people do you think were involved?
5          MR. HUQ:  Objection.  Speculation, Your Honor.
6          THE COURT:  Overruled.
7     A    It was hundreds of people.  It was hundreds of
8  people coming towards us.
9     Q    (Mr. Millikan)  That was your perception?
10     A    That was our perception.
11     Q    Not what you've seen on the video.  What your
12  perception was at the time?
13     A    Yes.  I could see all the way down the street.
14  It seemed like it was hundreds of people coming towards
15  us.
16     Q    Did any individuals out of this crowd stand out
17  to you?
18     A    Yes, they did.
19     Q    Tell us about that.
20     A    One gentleman he was directly in front of
21  Detective Olsten.  I was virtually maybe here to the bench
22  right here from the subject.  I could hear everything.  He
23  was yelling at Detective Olsten, calling names.  Saying he
24  would do harm to Detective Olsten and daring him to mace
25  him and take him into custody.

91

1     Q    Did you hear Olsten give any command at that
2  point?
3     A    Yes.  He told the subject to get back.
4     Q    You were how far away from Mr. Olsten when this
5  happened?
6     A    We were possibly -- I was almost an arm length
7  of Detective Olsten when this happened.
8     Q    You heard everything?
9     A    I heard everything.
10     Q    What happened next?
11     A    After Detective Olsten told him to get back, the
12  subject continued to come forward in a threatening manner.
13  Detective Olsten deployed the mace.
14     Q    When he deployed the mace, what happened next?
15     A    When he deployed the mace, the mace did its job
16  what its purpose is.  The subjects retreated and all the
17  other subjects that were coming up the street, the whole
18  crowd, the crowd dispersed.
19     Q    Did the deployment of the mace prevent a
20  physical confrontation?
21     A    Yes, it did.
22     Q    After the mace was used, you, as the supervisor,
23  did you direct your officers to go arrest the people who
24  were maced?
25     A    No, I didn't.

92

1    Q    Why?

2    A    Because at that point it was hundreds of people

3    in the crowd.  To prevent injury of suspects and/or our

4    officers, I made the choice of not going in and causing

5    more panic and injuries.

6    Q    Was it practical at that point?

7    A    It was not practical at all to arrest anyone.

8    Q    Because of the number of people?

9    A    That's correct.

10   Q    You saw the whole thing.

11   A    I saw the whole thing.

12   Q    You've been on the police department 28 years?

13   A    Yes.

14   Q    Have you yourself been in resistings during that

15   time?

16   A    Yes.  In my 28 years, yes.

17   Q    Do you believe that Mr. Olsten's use of mace

18   under those circumstances was reasonable?

19   A    Yes, I do.

20        MR. HUQ:  Objection, Your Honor.  Insufficient

21   foundation for an expert opinion.

22        THE COURT:  What is your response to that?

23        MR. MILLIKAN:  First of all, this is not an

24   expert opinion.  This is an opinion of an officer who

25   saw —

93

1        THE COURT:  I'm sorry.  It is or it is not?

2        MR. MILLIKAN:  It is not.  It's the opinion of a

3   witness who observed what happened.  He's the supervisor

4   of Mr. Olsten.  I can lay the foundation if I need to.  He

5   was there.  He witnessed what happened.  He was

6   supervising Mr. Olsten.

7        THE COURT:  Sustained to foundation.

8        MR. MILLIKAN:  Your Honor, can I ask of you to

9   have Exhibit 3?  May I publish to the witness?

10        THE COURT:  You may.

11   Q    (Mr. Millikan)  Sergeant Bartlett, if you could

12   turn to page 630.  What I want to go over first is

13   Section B-2A.  If you could read for us Section B-2

14   there, just that first sentence.

15   A    Officers may use nondeadly force for the

16   resolution of the incident that follows.

17   Q    Is nondeadly force — does that include the use

18   of pepper mace?

19   A    Yes, it does.

20   Q    Including mace that's in a fog canister?

21   A    Yes, it does.

22   Q    Read that Subsection A for me, 2-A.

23   A    To protect themselves or others from physical

24   harm.

25   Q    Did you believe, you, that night just before

94

1    Officer Olsten deployed the mace — did you believe that

2    you or your officers could be in physical harm?

3    A    Yes, I did.

4    Q    I'd like to go to Section 2-C.  Read that for

5    us.

6    A    To bring any unlawful situation safely and

7    effectively under control.

8    Q    In this same situation were protesters

9    disobeying an order to get back?

10   A    Yes, they were.

11   Q    Was that unlawful?

12   A    Yes, it was.

13   Q    Did the use of that mace safely and effectively

14   bring the situation under control?

15   A    Yes, it did.

16   Q    So applying the facts to this policy, do you

17   believe that what Officer Olsten did that night was

18   reasonable?

19        MR. HUQ:  Objection, Your Honor.  This witness

20   is not the trier of fact.

21        THE COURT:  Overruled.

22   A    Yes, I do.

23   Q    (Mr. Millikan)  At any point were you

24   anticipating using the mace?

25   A    Yes, I was.

95

1    Q    Tell us about that.

2    A    Yes.  If the crowd didn't get back, if

3    Mr. Olsten wouldn't have deployed the mace, I would have.

4        MR. MILLIKAN:  Nothing further.

5                    CROSS-EXAMINATION

6    QUESTIONS BY MR. HUQ:

7    Q    Sergeant, do you remember seeing the Maverick

8    video at our office?

9    A    Yes.

10   Q    Can you tell the Court who this is?

11   A    That's Detective Zajac.

12   Q    Was he on your team that night?

13   A    Yes, he was.

14   Q    He was, therefore, under your command?

15   A    Yes.

16   Q    Was he controlling traffic at this point?

17   A    At this point he was allowing the protesters to

18   walk south on Broadway.

19   Q    Are any officers directing traffic in the street

20   at this point in the evening?

21   A    The traffic was all stopped.

22   Q    Who is he waving to?

23   A    These cars.  Like I said, at this point the

24   subjects had all passed.

25   Q    When you see him waving like this, is he waving

96

1  to traffic?

2      A   Yes, waving to traffic.  That's me right there

3  on that side of the video.  That's me.  That's him.

4  That's me.  That's the rest of my detectives.

5      Q   Do you see these officers in the background?

6      A   Yes.

7      Q   Were they on your team that night as well?

8      A   Yes, they were.

9      Q   Do you know who they're waving to and directing?

10     A   Traffic.

11     Q   To be clear, they're directing this traffic?

12     A   Yes.

13     Q   Is that the defendant?

14     A   Yes, it is.

15     Q   Did you hear someone just say I'll fuck you up?

16     A   Yes.

17     Q   Was that Amir Brandy?

18     A   I'm not sure who it was.

19     Q   But you heard someone yelling I'll fuck you up

20  to the officer?

21     A   Yes.

22     Q   Did the defendant just say come and fuck me up

23  then?

24     A   I don't know.

25     Q   Did the defendant say come and fuck me up then?

1      A   Yes.

2      Q   Did the defendant just say get back.  He,

3  likewise, dared the other person to come fuck him up?

4      A   I wouldn't say dare him.  He said get back.

5      Q   We can agree that the defendant just said come

6  fuck me up then?

7      A   Yes.

8      Q   Keep coming.  Keep coming.  Is that what he

9  said?

10     A   I can't tell.

11     Q   Keep coming?

12     A   I just heard him say the word come on.  I don't

13  know if he was talking to the defendant.  He said come on.

14     Q   The defendant was on your team for about one to

15  two years?

16     A   Yes.

17     Q   Special operations?

18     A   Yes.

19     Q   That's different from civil disobedience, right?

20     A   We all, St. Louis Police, train for civil

21  obedience.

22     Q   But the special operations team is not the same

23  thing as the civil disobedience team; is that correct?

24     A   That's correct.

25     Q   During that time on your team, you guys did

1  undercover work, right?

2      A   Yeah, we did.

3      Q   Guns?

4      A   Yes.

5      Q   Narcotics?

6      A   Yes.

7      Q   Fairly dangerous?

8      A   Yes.

9      Q   Been in shoot-outs before with it?

10     A   Yes.

11     Q   You haven't been in shoot-outs at protests

12  though, right?

13     A   I haven't, but, yes, officers have been shot

14  during protests.

15     Q   Your team has not been involved in shoot-outs

16  during protests; is that right?

17     A   No, my team wasn't.

18     Q   This wasn't like a January 6th D.C. situation?

19     A   No.

20     Q   During that time on your team, you got to know

21  the defendant; is that right?

22     A   Yes.

23     Q   Along with your other team members I'm sure, of

24  course, right?

25     A   Yes.

1      Q   Having known the defendant — how long did you

2  know him at this point?

3      A   I'm not sure.  I've been transferred, moved

4  around.  Over a year I believe.

5      Q   Probably at least a year at this point?

6      A   Yes.

7      Q   Having known him for a year as his commander at

8  this point on September 29th, 2017, does he look fearful

9  to you?

10     A   Just because — I don't know how he looks when

11  he's fearful.  I've never seen him afraid.

12     Q   You've never seen him afraid?

13     A   Yes.

14     Q   Is it fair to say you don't think he's afraid at

15  this time either?

16     A   I don't know how he looks when he was afraid.

17     Q   At the time that you've known the defendant,

18  you've never seen him afraid?

19     A   I don't know what his afraid face looks like.

20     Q   At the time that you've known the defendant,

21  have you ever seen him pissed off?

22     A   Yes.

23     Q   Does he look pissed off to you?

24     A   No.  It looks like he's looking to his side to

25  make sure nobody is coming from the other side.

```
1      Q   You did get to know the defendant over the time
2   that he was under your command?
3      A   Yes.
4      Q   Bonded with him and the other teammates as well?
5      A   Yes.
6      Q   Had him over to your home?
7      A   Yes, my whole team, yes.
8      Q   Obviously you were his commanding officer?
9      A   Yes.
10     Q   Obviously one of your team, right?
11     A   Yes.
12     Q   Just like he was one of your team that evening
13  September 29th?
14     A   Yes.
15     Q   Is that the use of force instructions that you
16  have there?
17     A   Yes, it is.
18     Q   If you don't mind turning to what would be page
19  632.  I appreciate your patience.  We've talked about
20  several different things with you before.  Is page 632 —
21  is that the beginning of the policy instruction on the use
22  of nondeadly force pepper mace?
23     A   Okay.
24     Q   Was that a yes?
25     A   Yes.
                        101
```

```
1      Q   Do you see where it says section A Def-Tech Mark
2   IV pepper mace?
3      A   Yes.
4      Q   Do you see section B that says use of pepper
5   mace?
6      A   Yes.
7      Q   When you turn the page, can you see within
8   section B, number three?
9      A   Yes.
10     Q   Does that sentence begin since pepper mace can
11  adversely affect persons?
12     A   Yes.
13     Q   I'm going to read it.  Just let me know if I'm
14  reading it correctly.  Pepper mace can adversely affect
15  persons in the immediate area of the person against whom
16  it is used.  An officer should make every effort to avoid
17  unnecessarily exposing bystanders to pepper mace.  Did I
18  read that correctly?
19     A   You did.
20     Q   The video that we just watched, did you see the
21  defendant spraying it in a sweeping motion from side to
22  side?
23     A   I saw him spraying all of the subjects that were
24  aggressing toward him.
25     Q   Did you see him spraying it in a sweeping motion
                        102
```

```
1   from side to side?
2      A   Yes, that was the proper way to disperse that
3   mace.
4      Q   Did you see that the person who was yelling
5   abusive things to the defendant was right in front of him
6   at that time?
7      A   Yes, he and other people, yes.
8      Q   The person who was using yelling pussy ass white
9   boy, put the shit in my face, and I'll fuck you up, that
10  person was right in front of the defendant; is that
11  correct?
12     A   Yes, he was one of the persons, yes.
13     Q   He was right in front of the defendant?
14     A   Yes.
15     Q   Just to demonstrate, if you're the defendant and
16  I'm Amir Brandy, I'm right about here, maybe a little bit
17  closer?
18     A   Yes.
19     Q   I'm yelling all the nasty things that I'm
20  yelling.  Then you are sweeping not only spraying it right
21  in my face, but getting everyone from here all the way to
22  here; is that right?
23     A   That's correct.
24     Q   This was a demonstration.  We're talking about
25  everyone over here at this point is getting sprayed?
                        103
```

```
1      A   No.  Amir Brandy was not the only subject.
2      Q   That wasn't my question.  For purposes of this
3   demonstration, everyone at this point in this room is
4   getting sprayed from here all the way to where Judge Clark
5   is sitting; is that right?
6      A   Yes, this distance it is.  Further back they
7   wouldn't get hit.
8      Q   Obviously not the entire crowd was getting
9   sprayed with mace, correct?
10     A   Yes.
11     Q   As far as you know, there were no other
12  altercations with police officers at that protest on that
13  night?
14     A   No, I don't recall any other altercations.
15     Q   In other words, just the guys on your team?
16     A   No.  After I gave the order for the traffic to
17  start moving, yes, that's when the altercations started.
18     Q   Altercations continued after this event?
19     A   No.  From the video you showed me, you showed
20  the traffic moving.  The traffic was moving, because I
21  gave the order for it to move.  Stuff started happening
22  after that.
23     Q   As far as you know, on September 29th, 2017,
24  downtown at this protest, there were no other altercations
25  with police officers; is that right?
                        104
```

1    A    That's correct.  I don't recall.

2    Q    You don't recall.  In other words, the only

3  altercation that occurred, which is after you started

4  directing traffic, happened with the officers on your

5  team; is that right?

6    A    That's correct.

7    Q    Special ops team?

8    A    That's correct.

9    Q    Earlier when Mr. Millikan was asking you

10  questions, you said that the use of the pepper spray

11  prevented a physical altercation from happening.  Do you

12  remember saying that?

13    A    Yes.  It prevented it further.

14    Q    You remember saying that?

15    A    Yes.

16    Q    You don't really know that a physical

17  altercation was about to occur?  You think it might have.

18  You don't know for sure?

19    A    We thought it was.  We didn't want it to happen.

20    Q    Understood.  You can't say with certainty that

21  there was about to be a physical altercation?  I just want

22  to make clear that that was your prediction or that was

23  your concern, that we don't know for sure that it

24  prevented it, because we can't say for sure that there was

25  going to be a physical altercation.  Would you agree with

105

1  that?

2    A    Yes, I said I believe it prevented it.  That was

3  a belief of mine.  It was my opinion.

4    Q    In other words, you don't know for sure that

5  there would have been.  Would you agree with that?

6    A    It was already occurring.  The physical

7  altercations had started.

8    Q    So the physical altercation had not started?

9    A    It already started.

10    Q    So it did start?

11    A    Yes.

12    Q    Who got physical?

13    A    When the subject came --

14    Q    When he was yelling?

15    A    No.  The physical altercation occurred earlier.

16  Then when people started to aggress toward us, to prevent

17  further physical altercations, we had to deploy mace.

18    Q    So you were concerned that there would be.  You

19  don't know for sure that there was going to be continued

20  physical altercation?

21    A    No, because we deployed mace to prevent it.

22    Q    So you know for sure that there was going to be

23  a fight?

24    A    No one knows for sure.  However --

25    Q    No one knows for sure?

106

1    A    I know for sure nothing happened after that,

2  after we deployed mace.

3         MR. HUQ:  I don't have any further questions at

4  this time, Your Honor.

5              REDIRECT EXAMINATION

6  QUESTIONS BY MR. MILLIKAN:

7    Q    Judge, briefly.  Earlier, sergeant, you had

8  stated that numerous people surrounded your location as

9  you're bringing the subject back; is that right?

10    A    That's correct.

11    Q    When you say surround, what does that mean?

12    A    That means coming from the front and the sides,

13  and possibly could have been coming from the rear.  We

14  were looking all around making sure that we didn't get

15  surrounded.

16    Q    Did you consider the people that were to your

17  left and to your right to be innocent bystanders?

18    A    No, I didn't.

19         MR. MILLIKAN:  Okay.

20         MR. HUQ:  Your Honor, may I approach the bench?

21  I just want to retrieve the photographs.

22         THE COURT:  What specifically do you need?

23         MR. HUQ:  Exhibits 5 through 10.  Thank you,

24  Your Honor.  May I approach the witness, Judge?

25         THE COURT:  You may.

107

1              RECROSS-EXAMINATION

2  QUESTIONS BY MR. HUQ:

3    Q    Sergeant, I'm handing you Exhibits 5 and 6, as

4  well as Exhibit 9.  Is that just following the point where

5  the defendant deployed the spray?

6    A    I would assume so since the subject is turned

7  around.  Looked like he was retreating.

8    Q    You can see the intersection behind you guys?

9    A    Yes, I can.

10    Q    Does it look like traffic is being controlled by

11  police officers at that point?

12    A    No, it's not really being controlled by police

13  officers.

14    Q    Does it look like you're surrounded at that

15  point?

16    A    Yes, it's civilians behind us in regular clothes

17  and cars behind us to prevent us from going any further

18  back.

19         MR. HUQ:  Thank you.  I'll retrieve those.  Your

20  Honor, can I hand these back to you, sir?  No further

21  questions, Judge.

22         THE COURT:  May this witness be excused?

23         MR. MILLIKAN:  Yes, Your Honor.

24         MR. HUQ:  Yes, Judge.

25         THE COURT:  You're off subpoena.  You may call

108

1  your next witness.

2         MR. MILLIKAN:  At this time the defense rests.

3                    DEFENSE RESTS

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

109

1                    CERTIFICATE

2         I, Dawn L. McTeer, Certified Court Reporter,

3  do hereby certify that I am an official court reporter for

4  the Circuit Court of the City of St. Louis; that on April 6,

5  2021, I was present and reported all the proceedings had in

6  the case of STATE OF MISSOURI, Plaintiff, vs. WILLIAM C.

7  OLSTEN, Defendant, Cause No. 1922-CR02199-01.

8         I further certify that the foregoing pages

9  contain a true and accurate reproduction of the

10  proceedings.

11

12

13

14

15         /s/Dawn L. McTeer

16         _____

17         Dawn L. McTeer, CCR, RPR, MO-CSR, IL-CSR
                          CCR #429

18

19

20

21

22

23

24

25

110