**IN THE UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
MISSOURI EASTERN DIVISION**

| | | |
|---|---|---|
| JAZMIN FRANKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF SAINT LOUIS, MISSOURI, | ) | Cause No.: 4:19-cv2663 |
| COL. JOHN HAYDEN, in his | ) | |
| individual capacity, and | ) | |
| OFFICER WILLIAM OLSTEN, | ) | |
| in his individual capacity. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' STATEMENT
OF UNCONTROVERTED MATERIAL FACTS**

Defendants, City of St. Louis, and Col. John W. Hayden file these statements of

uncontroverted facts in support of their motion for summary judgment. All facts asserted

herein are set forth for the purposes of this motion only.

1.      On September 15, 2017, the verdict in the criminal case of the State of Missouri v.

Jason Stockley was released. (Doc. 1, ¶ 13).

2.      In response to the verdict, many people began to protest in downtown St. Louis on

that day. (Doc. 1, ¶ 19).

3.       Protests that began on September 15, 2017, carried on for more than a month after

the verdict was released. (Doc. 1, ¶26; Exhibit A, Deposition of Steven Schroeder,

37:18-38:1)

4.      On September 15, 2017, the protests centered on the downtown area, at one point
        the protests moved to the area around Clark and Tucker. (Exhibit B, Transcript of
        Ahmad Hearing Transcript, Volume II, 148:17-149:16)

5.      SLPD had brought multiple busses to this location for the purpose of taking the
        officers away from this location. (Ex. B, Ahmad Hearing Transcript 149:19-15).

6.      SLPD hoped that moving the SLPD out of the area would prevent the protest from
        escalating. (Ex. B., Ahmad Hearing Transcript 148:17-149:16)

7.      However, after CDT teams loaded the busses, protestors began to surround the busses,
        preventing them from leaving. (Ex. B, 149:19-150:11).

8.      At various points, protestors were throwing objects at the buses. (Ex. B, 149:19-150:11;
        Exhibit C, Real Time Crime Center Video from 9/15/17, at 1:26:50; 1:28:15).

9.      At least one of the objects thrown was hard enough to break a window on one of the
        busses. (Exhibit D, October 16, 2020 Deposition of Gregory Schaffer, 45:17-46:3).

10.     Over the Course of the weekend, several officers were reported as having been
        injured by items thrown or sprayed on them by protestors. (Exhibit P.  Injury
        Reports; Exhibit E, Brian Rossomanno Depo., 162:11-15)

11.     At one point, people in the crowd can be seen breaking up concrete near a man-hole
        covering and throwing pieces of the concrete towards the officers. (Ex. E, 170:1-
        172:16; Exhibit F, CITY 000060 video at08:16-08:44)

12.     On September 17, 2017, after a peaceful march ended, several protestors ran
                downtown and caused significant property damage. (Ex. E., Rossomanno
                Depo, 170:1-172:16)

2

13. The protests that began on September 15, 2017, lasted for nearly one month. (Ex. A, Deposition of Steven Schroeder, 37:18-38:1)

14. On September 29, 2017, a protest took place at Busch Stadium in response to  the verdict in State v. Jason Stockley. (Doc. 1, ¶¶ 26, 37-40)

15. This protest was part of a larger series of protests that took place beginning on the date the verdict was released, September 15, 2017. (Doc. 1. ¶¶ 19, 26)

16. While some form of protesting took place nearly every day until late October, tensions increased the most on September 15, 2017, September 17, 2017, and September 29, 2017. (Doc. 1, 26; Ex. A, Deposition of Steven Schroeder, 37:18-38:1)

17. At various time on those dates, the protests grew violent in nature, requiring a more significant police response. (Ex. B, 150:6-11; Ex. C, Real Time Crime Center Video from 9/15/17; Ex. D, Gregory Schaffer Depo, 45:17-46:3; Ex. E., Rossomanno Depo, 170:1-172:16; Ex. F, CITY 000060 at08:16-08:44)

18. In each case, the violence began by individuals in and amongst those who were protesting, causing injuries to several police officers. (Ex. P, Injury Reports.)

19.  On September 29, 2017, Officers from the Special Operations Unit were blocking off a road near Busch Stadium to allow for protestors to march in the street. (Exhibit J Hayden Depo. 30:4-11).

20. As the line of marchers began to thin, the officers stopped the remaining marchers to allow some of the backed up traffic to flow through. (Ex. G Maverick Video, Pl. 000027)

21. At one point, Officer Marcin Zajac asked a few protestors to stop so that a few

vehicles could move through an intersection. (Ex. GMaverick Video, Pl.

000027)

22.    An altercation then ensued between multiple officers and at least two    protestors, in

which an officer deployed a taser. (Ex. G Maverick Video, Pl. 000027)

23.    Officer Olsten was not involved in the arrests or that tasing, but he did help    escort

one of the arrestees, Mr. Kennedy away from the scene. (Ex. G  Maverick Video, Pl.

000027)

24.    As he handed Mr. Kennedy off, Officer Olsten stayed because a crowd was

forming behind him. (Ex. G, Pl. 00027, 1:00-1:56; Exhibit H, Olsten

Deposition, 66:25-67:3. Ex. I, RTCC video from 9-27-17.)

25.    Several protestors who had already passed were coming back to the area. (Ex. G, Pl.

00027; Ex. H., Olsten Depo., 68:1-8; 75:10-19

26.    As they were approaching him, at least one protestor, Mr. Brandy, was  shouting

threats at Mr. Olsten, stating "I'll f-ck you up." (Ex. G, Pl. 000027, 1:25-1:55).

27.    He was also shouting a challenge to Officer Olsten "put that shit in my face."  (Ex.

G., PL. 000027, at 1:35)

28.    During the time that these words were being shouted at Officer Olsten, he did not

raise his pepper spray can or even respond. (Ex. G, Pl. 000027, 01:00-01:55).

29.    He did make multiple commands to "get back," none of which are followed    by

anyone in front of him. (Ex. G, Pl. 0027 at 01:45; Ex. H, Olsten Depo., 73:16-20)

30.    Olsten does not respond to these words until someone shouts something else.

(Ex. G., Ex. G, 0027 at 1:55)

31.   You can hear a female voice shout "shoot this motherf-cker." (Ex. G at 1:55)

32.   Only then does Olsten deploy his pepper spray. (Ex. G at 1:55)

33.   Ms. Franks was the woman in the light, flowy dress recording the police, and was standing in the direction of the stream of spray, near Mr. Brandy who was within a foot or two of Officer Olsten. (Doc. 1, paras. 62, 66; Ex. G, at 01:49. Exhibit I, RTCC Video from 9-27-17, 1:08-1:50.)

34.   Commissioner Hayden did not give any order to deploy pepper spray. (Ex. H, Olsten Depo., 109:24-110:6; Exhibit J, Deposition of Commissioner Hayden,  44:11- 13)

35.   Officer Olsten did not make any statement or provide any other advance knowledge that he was going to use any force prior to doing so. (Ex. H, Olsten Depo., 109:24-110:6)

36.   The video clearly shows that Chief Hayden had his back turned when the spraying began. (Ex. G, Pl. 000027 at 1:55).

37.   He was several feet away, and had no knowledge that any force was going to be used. (Ex. G, Pl. 000027 at 1:55)

38.   After the initial protests in Ferguson in 2014, then Sergeants Jemerson and Rossomanno were place in charge of the CDT teams. (Ex. E, Rossomannno Depo., 31:14-17; 63:23-64:20)

39.    They instituted trainings that took place on a quarterly basis, including adding it to the mandatory training of all recruits. (Ex. E, Rossomannno Depo., 65:7-20)

40.   As part of their attempts to retrain and expand their protest response, the SLPD created a BRT unit after two employees of the SLPD returned from observing the

police response to the Republican National Convention in 2016. (Exhibit K, Randy Jemerson Depo., 40:17-41:20)

41.   Officer Olsten testified that his spray was initially directed to Mr. Brandy, but that he also needed the entire group to move back. (Ex. H, 71:6-11)

42.   Further, the entire spray took place over four seconds. (Ex. G, PL. 000027)

43.   Commissioner Hayden testified that the scene was a flashpoint for violence    and that he was calling for assistance. (Ex. J, Hayden Depo., 43:22-44:4 )

44.   He does not even recall much of his steps after that because of the volatility    of the    situation. ((Ex. J, Hayden Depo, 46:17-25)

45.   The only self-insurance plan that is duly adopted states that the City is only self-insured as it relates to the claims that are excluded from the sovereign   immunity statute (Exhibit L, City Ordinance 4.12.030)

46.   Further, a Missouri state court has ruled that the PFPC is not insurance or a self-insurance plan that waives sovereign immunity. (Exhibit M, Order in *Hendrix v. City*, Case No. 1722-CC01430).

47.   The Eastern District of Missouri has upheld that ruling. (Exhibit N, Order in *Hendrix v. City*, Case No. ED108858.)

Respectfully submitted,

SHEENA HAMILTON
CITY COUNSELOR

*/s/ Catherine Dierker*
Catherine Dierker 70025MO
Assistant City Counselor
dierkerc@stlouis-mo.gov
Brandon Laird 65564 MO

6

Associate City Counselor
lairdb@stlouis-mo.gov
Robert H. Dierker 23671MO
Deputy City Counselor
dierkerr@stlouis-mo.gov
Abby Duncan 67766 MO
Associate City Counselor
duncana@stlouis-mo.gov
1200 Market St.
City Hall, Rm 314
St. Louis, MO 63103
314-622-3361
Fax 314-622-4956